UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,

     -against-

                                NOT FOR PUBLICATION
QING MING YU,                        **MEMORANDUM & ORDER**
     a/k/a "Allen Yu," and            22-cr-208 (CBA)
ZHE ZHANG,
     a/k/a "Zack,"

                 Defendants.
--------------------------------------------------------x

**AMON, United States District Judge:**

## INTRODUCTION

On December 6, 2022, Defendants Qing Ming "Allen" Yu ("Yu") and Zhe Zhang ("Zhang") (collectively, "Defendants") moved to suppress all evidence seized pursuant to three search warrants: (i) a warrant to search Yu's house in Oyster Bay, New York, (ii) a warrant to search Zhang's house in Arcadia, California, and (iii) a warrant to search Zhang's Instagram account (username: newyorkzz). (ECF Docket Entry ("D.E.") # 81 ("Yu Mot."); D.E. # 82 ("Yu Mem."); D.E. # 84 (Zhang Mot.); D.E. # 89 ("Zhang Mem.").) Yu additionally moved for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) ("Franks hearing"). (Yu Mot.) Zhang separately moved for the government to file a Bill of Particulars identifying any unindicted coconspirators. (Zhang Mem. 38-40.)

The government filed an opposition, and both Defendants subsequently filed replies. (D.E. # 91 ("Gov't Opp'n"); D.E. # 97 ("Yu Reply"); D.E. # 98 ("Zhang Reply").) The government and Zhang also filed supplemental letters addressing various disputes. (D.E. # 101 ("Gov't Let. Jan. 19, 2023"); D.E. # 103 (Gov't Let. Jan. 23, 2023); D.E. # 104 ("Zhang Let. Jan. 26, 2023"); D.E. # 114 ("Gov't Let. Mar. 14, 2023").) Two hearings were held on January 12,

1

2023 ("Jan. 12, 2023 Hr'g Tr.") and on March 7, 2023 ("Mar. 7, 2023 Hr'g Tr."). For the reasons below, Yu's motion is DENIED, and Zhang's motion is GRANTED IN PART and DENIED IN PART.[1]

## BACKGROUND

This is a murder-for-hire conspiracy case arising from an alleged business dispute between the victim Xin "Chris" Gu ("Gu") and Yu; the other defendants are the alleged coconspirators: Zhang, You You, and Antony Abreu ("Abreu"). The Court presumes familiarity with the background of this case and summarizes only the relevant facts below.[2]

### I. The Crime

Gu was a former employee and alleged protégé of Yu, who operated a development company, Amaco Management and Consulting, Inc. ("Amaco"). (Yu Mem. 2; Gov't Opp'n 1-2.) Gu started working for Yu in approximately 2015 and allegedly excelled at the job, bringing in clients and new projects. (Gov't Opp'n 1-2.) In August 2018, Gu left Amaco to form a rival company, K&G Management, taking with him at least some of Amaco's clients. (Id. at 1-2,

---

[1] Defendants also raised several issues in their papers that are now moot. For Yu: First, Yu moved for reconsideration of my earlier decision denying his pretrial bail, and I denied his motion on the record at the January 12, 2023 hearing. (Yu Mem. 41-45; Minute Entry dated Jan. 12, 2023.) Second, Yu also moved for a return of six items allegedly seized beyond the scope of the Yu Premises Warrant, and the government agreed to return those items at the March 7, 2023 hearing, (Yu Mem. 36-37; Minute Entry dated Mar. 7, 2023).

For Zhang: First, Zhang demanded the return of nine items (1B100, 1B101, 1B102, 1B113, 1B114, 1B123, 1B125, 1B127, and 1B129) that the government allegedly searched beyond the time period permitted by the Zhang Premises Warrant, and the government agreed to return them. (Zhang Mem. 37 n.10; Zhang Let. Jan. 26, 2023, at 3.) Second, Zhang alleged that five cellphones (1B84, 1B85, 1B86, 1B93, and 1B96) were also searched beyond the time period, and upon my ruling at the March 7, 2023 hearing, the government filed an affidavit attesting to having completed all searches within the appropriate deadline. (Zhang Mem. 19-20; D.E. # 114-1 (Gov't Aff.) 4.) Third, Zhang sought the return of six electronic devices (1B82, 1B83, 1B87, 1B89, 1B92, and 1B95) that, at the time of his motion, had not yet been decrypted by the government. (Zhang Let. Jan. 26, 2023, at 3.) Since the filing of that motion, the government has decrypted one device and returned it upon finding no responsive material, and the government has agreed to return the remaining five still-encrypted devices. (Mar. 7, 2023 Hr'g Tr. 24:1-5; Gov't Let. Mar. 14, 2023, at 3.)

[2] For additional context, see the prior Memorandums and Opinions denying Yu's and Zhang's respective motions for bail. (D.E. ## 53, 64.)

2

21 n.6.)  Yu then allegedly plotted to kill Gu and recruited his nephew, You You, who in turn executed the plan with Zhang, Abreu, and at least one unindicted coconspirator.  (Id. at 2, 4.)

On February 12, 2019, at approximately 2:34 a.m., Gu was shot and killed as he exited the Grand Slam KTV (located at 131-01 Fowler Avenue in Queens, New York), where he was hosting an after-party to his Lunar New Year party.  (Id. at 10.)  Allegedly, Abreu was the shooter, and Zhang was the getaway driver.  (Id. at 2, 10.)  You You and the unindicted coconspirator were allegedly on the scene in a separate vehicle observing the shooting.  (Id. at 2, 11-12.)  After the shooting, You You and Zhang fled to Philadelphia, and over the course of several months, both were allegedly paid by Yu, including through checks issued to a corporate entity connected to Zhang.  (Id. at 12-13.)  Subsequently, Zhang relocated to California.  (Zhang Mem. 2.)

On May 4, 2022, a grand jury indicted Yu, Zhang, You You, and Abreu on one count of murder for hire and one count of murder-for-hire conspiracy (collectively, "the murder-for-hire crime"), in violation of 18 U.S.C. § 1958(a).  (D.E. # 1 (Indictment).)

## II.    The Search Warrants

### A.    Yu Premises Warrant

On April 29, 2022, Magistrate Judge Ramon E. Reyes issued the Yu Premises Warrant. (D.E. # 82, Ex. A ("Yu Premises Warrant").)  The Yu Premises Warrant sought to seize records relating to the murder-for-hire crime, communications among the coconspirators, financial records of various corporate entities with possible connection to the crime, and "[a]ny electronic devices . . . that contain[] or in which is stored records or information that is otherwise called for by this warrant."  (Id. ¶¶ 1-5.)  For each item to be seized, the Yu Premises Warrant specifies a temporal limitation.  (Id. ¶ 1)  Federal Bureau of Investigation ("FBI") Special Agent Donald Ford filed a supporting warrant affidavit, which relies on information provided by, among others, Witness-1, Witness-2, and a cooperating witness ("CW-1"), who is identified as the unindicted

3

coconspirator and who has already pleaded guilty to the offense of murder-for-hire conspiracy. (D.E. # 82, Ex. A ("Ford Aff.") ¶¶ 6, 7, 19 & n.5.)

On May 10, 2022, officers executed the warrant and arrested Yu, seizing approximately twenty-two items, including various business records, $11,000 in cash, ten firearms, and multiple electronic devices. (Yu Mem. 10-12; Gov't Opp'n 4.)

## B. Zhang Premises Warrant

On May 9, 2022, Magistrate Judge Jacqueline Chooljian of the Central District of California issued the Zhang Premises Warrant. (D.E. # 89-1 ("Zhang Premises Warrant").) Although it resembles the Yu Premises Warrant and likewise includes temporal limitations, the Zhang Premises Warrant has a broader scope and authorizes the search for evidence of two additional crimes: (i) narcotics offense in violation of 21 U.S.C. § 841, and (ii) witness retaliation in violation of 18 U.S.C. § 1513. (Id. ¶ 1.) FBI Special Agent Christopher Lin filed a supporting warrant affidavit, which is similar in content to the Ford Affidavit and relies on the same witnesses. (D.E. # 89-2 ("Lin Aff.").)

Officers executed the Zhang Premises Warrant on the same day as the Yu Premises Warrant, seizing forty-nine items, including various financial records, multiple electronic devices, luxury watches, and some quantities of marijuana. (D.E. # 89-6 ("Zhang Evidence Log").)

## C. Instagram Warrant

On March 25, 2022, Magistrate Judge Robert M. Levy issued the Instagram Warrant. (D.E. # 89-4 ("Instagram Warrant"); Gov't Opp'n 45.) The Instagram Warrant contains two provisions. Under "Information to be disclosed by Instagram" (the "Disclosure Clause"), the Instagram Warrant broadly sought "[a]ll business records and subscriber information" for the account's login, usernames, length of service, advertising information, and content generation, among others, for the period of August 1, 2018 to the date of the warrant. (Instagram Warrant,

4

Attachment B, § 1.)  Under "Information to be seized by the government" (the "Seizure Clause"),

the Instagram Warrant permits the government to seize a narrower set of information tailored to

the same three crimes as the Zhang Premises Warrant.[3]  (Id. § 2.)  FBI Special Agent Christopher

Lin filed a supporting warrant affidavit, which resembles the other two warrant affidavits.

(D.E. # 89-5 ("Lin-Instagram Aff.").)

## DISCUSSION

Yu and Zhang raise overlapping, but also distinct, arguments challenging their warrants.

The overlapping portions are discussed together, where possible.

### I.    The Premises Warrants

I begin with the two Premises Warrants.  Defendants argue that the Premises Warrants

(a) were not supported by probable cause and (b) were overbroad and/or lacking in particularity.

### A.    Probable Cause[4]

Yu and Zhang first challenge the Premises Warrants as lacking in probable cause, given:

(i) staleness of the information in the warrant affidavits, (ii) insufficient showing of nexus with the

premises to be searched, and (iii) insufficient showing of nexus with the electronic devices to be

searched.  (Yu Mem. 14-18, 27-32; Zhang Mem. 3-10, 17.)  Yu (but not Zhang) additionally argues

that the Yu Premises Warrant is "[s]ubstantively [d]eficient" for lacking sufficient corroboration

of the information provided by the witnesses.  (Yu Mem. 18-27.)

---

[3] There is one discrepancy between the two warrants:  whereas the Zhang Premises Warrant specifies witness "retaliation" under 18 U.S.C. § 1513, the Instagram Warrant specifies witness "tampering" under 18 U.S.C. § 1512. (Zhang Premises Warrant ¶ 1; Instagram Warrant § II.)  For the purpose of this opinion, the discrepancy is immaterial since the two offenses share similar elements.  Compare United States v. Draper, 553 F.3d 174, 179-80 (2d Cir. 2009) (listing the elements of witness retaliation), with United States v. McLaurin, 767 F. App'x 186, 187 (2d Cir. 2019) (summary order) (quoting the witness tampering/witness intimidation statute).  Where appropriate, I also consider case law addressing both offenses.

[4] With respect to Zhang, this sub-section addresses only the murder-for-hire crime; the other two crimes of narcotics offense and witness retaliation are addressed infra in Section I(E).

5

The Fourth Amendment provides: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). This analysis is "not overly strict" and requires a neutral magistrate to make a "practical, common-sense decision" given "all the circumstances set forth in the affidavit[.]" United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (quoting Gates, 462 U.S. at 238). A reviewing district court accords "substantial deference to the magistrate's finding" and limits its review to "whether the issuing judicial officer had a substantial basis for the finding of probable cause." United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004) (citation omitted). The party challenging probable cause faces a "heavy burden," Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991), and "doubts should be resolved in favor of upholding the warrant," United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983).

### i.      Staleness

Yu and Zhang argue that, because the government executed the Premises Warrants more than two years after Gu's murder, a "significant gap of time [elapsed] between the criminal conduct and the court authorized search," (Yu Mem. 17), rendering the information in the warrant affidavits "clearly stale and not of a sufficiently recent vintage," (Zhang Mem. 5). I do not find this argument compelling.

A warrant lacks probable cause "where the facts supporting criminal activity have grown stale by the time that the warrant issues." United States v. Disla Ramos, No. 22-cr-431 (LJL), 2022 WL 17830637, at *13 (S.D.N.Y. Dec. 21, 2022) (quoting United States v. Raymonda, 780 F.3d 105, 114 (2d Cir. 2015)). However, the Second Circuit has cautioned that there is "no bright-line rule for staleness," Walcyk v. Rio, 496 F.3d 139, 162 (2d Cir. 2007), and "the passage of time

is not controlling and is but one factor to be considered, along with the kind of property sought and the nature of the criminal activity," United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004); see also United States v. Zoernack, No. 04-cr-868 (LTS), 2005 WL 1837962, at *2 (S.D.N.Y. Aug. 2, 2005) ("The age of the information is relevant only in so far as it affects the likelihood that evidence will be found at the premises."). Here, despite the passage of time, the kind of property sought and the nature of the criminal activity support a finding of probable cause.

Regarding the kind of property sought, the Premises Warrants authorize the search and seizure of, in physical and digital forms, "records and information relating to [the murder-for-hire] conspiracy," "records and information concerning payment to a co-conspirators[]," "communication with co-conspirators," and "records . . . related to Amaco." (Yu Premises Warrant ¶¶ 1(a)-(i); see also Zhang Premises Warrant ¶¶ 1(a)-(g).) These are non-consumable items that are "not temporary in nature or likely to dissipate over the intervening time." United States v. LaMorte, 744 F. Supp. 573, 576 (S.D.N.Y. 1990). Unlike consumable evidence such as drugs, records and documents are "more apt to remain in one place for extended periods," United States v. Lamb, 945 F. Supp. 441, 460 (N.D.N.Y. 1996), and "likely [to] remain[] long after [the defendant's] criminal activity may have ceased," LaMorte, 744 F. Supp. at 575.

Regarding the nature of the crime, the warrants sought evidence of a murder-for-hire conspiracy that spanned multiple months—from August 2018 to February 2019—and involved at least five coconspirators. (Ford Aff. ¶¶ 9-28; Lin Aff. ¶¶ 12-30.) The warrant affidavits describe extensively the conspirators' use of various electronic devices, including cellphones, a burner phone, and encrypted applications such as WeChat, as well as their practice of hiding payments through corporate financial transfers.[5] (See, e.g., Ford Aff. ¶¶ 20, 24-25, 27, 35-36, 39; Lin Aff.

---

[5] For example, the warrant affidavits proffer that (i) You You "purchased a cellular telephone in Flushing, New York, to use in connection with the shooting," (Ford Aff. ¶ 20; Lin Aff. ¶ 22); (ii) Zhang "contacted [You You]

¶¶ 22, 26-27, 29, 36, 39.) Moreover, the warrant affidavits also proffer that the alleged motive for the crime originated with a business dispute between Yu and Gu.[6] (See, e.g., Ford Aff. ¶¶ 9-12; Lin Aff. ¶¶ 10-13.) Given this context, the kind of evidence that would be relevant includes corporate documents, copies of communications between the conspirators on electronic devices, records contained within applications such as WeChat, or records of financial transactions between the conspirators, among others. These types of evidence are those likely "stored in secure locations, under the control of the owner, for long periods of time." United States v. Russo, 483 F. Supp. 2d 301, 307 (S.D.N.Y. 2007).

The cases cited by Yu and Zhang are distinguishable. (Yu Mem. 17; Zhang Mem. 4-5.) First, Defendants quote United States v. Reyes for the proposition that "the information necessary to support a finding of probable cause should be no older than one year." 922 F. Supp. 818, 827 (S.D.N.Y. 1996) (citing Rivera, 928 F.2d at 602). Reyes and Rivera involve a different type of evidence—drugs—which is consumable and can disappear with time. See United States v. Saenz, No. 16-cr-403 (GRB), 2022 WL 17961205, at *4 (E.D.N.Y. Dec. 27, 2022) ("Some contraband, like narcotic drugs, are consumable." (citation omitted)). Second, Defendants cite three cases in which a shorter passage of time between the crime and the search rendered the information in the warrant affidavits stale. (Yu Mem. 17; Zhang Mem. 4; Zhang Reply 5.) However, these cases involve crimes of significantly shorter duration—typically only a single criminal act rather than a

---

and reported that the murder occurred as planned," (Ford Aff. ¶ 24; Lin Aff. ¶ 26); (iii) Zhang sent Abreu a text message ("Bro I left stuff in there. Hit me.") approximately 20 minutes after the murder, (Ford Aff. ¶ 25; Lin Aff. ¶ 27); (iv) Zhang "used the encrypted messaging services WhatsApp and WeChat[] to communicate with others," (Ford Aff. ¶ 27; Lin Aff. ¶ 29); and (v) Yu "issued two checks to Jetspeed Marketing Inc., whose signatory is [Zhang], for \$25,000 and \$5,000, respectively," (Ford Aff. ¶ 39; Lin Aff. ¶ 39).

[6] For example, the warrant affidavits proffer that (i) "Gu brought in approximately \$30,000,000 in revenue for Amaco," (Ford Aff. ¶ 9; Lin Aff. ¶ 10), and (ii) "Gu left Amaco and formed his own construction company," and at least one client "agreed to terminate his contract with Amaco and sign a new agreement with [Gu]," (Ford Aff. ¶ 11; Lin Aff. ¶ 12).

8

multi-month murder-for-hire conspiracy.  Cf. Raymonda, 780 F.3d at 116-17 (finding staleness when the warrant affidavit alleges "a single incident" of criminal activity from "nine-month-old evidence"); United States v. Wagner, 989 F.2d 69, 75 (2d Cir. 1993) (finding staleness when the warrant affidavit alleges a single criminal act dated six weeks before the search); United States v. Ohlson, No. 11-cr-225-A (RJA), 2012 WL 913037, at *2-3 (W.D.N.Y. Mar. 16, 2012) (finding staleness when the warrant affidavit alleges a "single five-day period" of criminal activity from "more than one year [ago]").  Zhang also cited an out-of-circuit case, United States v. Zimmerman, 277 F.3d 426 (3d Cir. 2002), for the proposition that "evidence more than six months old before search of defendant's home was 'entirely unreasonable.'"  (Zhang Reply 3.)  Zimmerman is likewise distinguishable.  There, the government sought a warrant to search, among others, evidence of adult pornography based solely on an allegation that the defendant had shown a pornographic video to several witnesses, yet the warrant affidavit "did not even suggest that [the defendant] ever downloaded the video clip [to his computer]."  Zimmerman, 277 F.3d at 435.

Accordingly, I reject Defendants' staleness argument.  Given the type of evidence sought (non-consumable records and documents) and the nature of the crime (a multi-month conspiracy involving electronic communications and corporate transactions), the issuing magistrates had a "substantial basis" for finding probable cause despite the passage of time between the crime and the search.  Singh, 390 F.3d at 181.

### ii.    Nexus with Premises

Yu and Zhang next argue that the information in the warrant affidavits insufficiently state nexus with the premises searched.  (Yu Mem. 27-29; Zhang Mem. 9.)  Again, this argument is unpersuasive.

The Second Circuit has held that probable cause to search a residence requires two factual showings:  (i) "that a crime was committed," and (ii) "that there is probable cause to believe that

9

evidence of such crime is located at the residence." Travisano, 724 F.2d at 345. However, "[a] showing of nexus does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." Singh, 390 F.3d at 182 (citations and internal quotation marks omitted). Further, the issuing magistrate must consider "all of the evidence together . . . on the 'totality of the circumstances,'" rather than "take each piece of evidence one by one and blind herself to it if each piece of evidence does not establish probable cause when taken in isolation." United States v. Ray, 541 F. Supp. 3d 355, 402 (S.D.N.Y. 2021) (quoting Gates, 462 U.S. at 230-31).

### a.     Yu

I begin with Yu's argument. Yu argues that nexus is satisfied "only where the warrant affidavit reveals that activities of the suspected crime occurred at the residence," (Yu Reply 3), and "no evidence [was] presented that Mr. Yu ever used his home to facilitate this alleged crime or any other crime," (Yu Mem. 28). As an initial matter, Yu is wrong that there is "no evidence" supporting an inference that he uses his home to facilitate the murder-for-hire crime. The warrant affidavit alleges that: (i) Yu "often communicated using encrypted applications, like WeChat," (ii) Yu's coconspirators also frequently used encrypted applications, like WeChat, WhatsApp, and Telegram, (iii) Yu has communicated with his employees "over email using a computer" and "through WeChat or text message," and (iv) Yu "sometimes worked from his home and reviewed electronic documents [there]." (Ford Aff. ¶¶ 7, 27, 50). Taken together, the issuing magistrate could reasonably infer, based on common sense, that Yu has used electronic devices and encrypted applications to communicate with his coconspirators while at home. See Travisano, 724 F.2d at 346 ("[Probable cause] is only a probability, and not a prima facie showing of criminal activity.").

More importantly, Yu is incorrect that nexus requires the suspected crime to have occurred "at the residence." (Yu Reply 3.) Yu cites three cases in which nexus was found when the alleged crime occurred at or near the premises searched.[7] (Id.) However, these cases do not support his position. Certainly, the fact that a searched premises happened to have been the site of the crime sufficiently satisfies the nexus requirement. But nothing in these cases suggests that proximity to the crime scene is a necessity. To the contrary, courts in this Circuit have upheld warrants where the premises searched do not have a direct connection to the crime scene. See, e.g., United States v. Rodriguez, No. 20-cr-150 (LJV), 2023 WL 3243213, at *9 (W.D.N.Y. May 3, 2023) (permitting officers to search a house that the defendant recently moved into, because "there still was reason to believe that [the weapon and stolen items] would be found there"); United States v. Juvenile Male, 968 F. Supp. 2d 490, 494, 514 (E.D.N.Y. 2013) (permitting officers to search the defendant's home for evidence of robberies committed at different locations, because "there was a fair probability that the defendant's premises would yield the objects specified in the search warrant" (citations, alterations, and internal quotation marks omitted)).

In this case, the proper inquiry considers whether there is probable cause that Yu had committed the alleged crime, and if yes, whether there is a likelihood of finding evidence of that crime at his home. See Travisano, 724 F.2d at 345. The warrant affidavit proffers sufficient facts for the issuing magistrate to conclude in the affirmative for both questions. First, the warrant affidavit provides probable cause to link Yu to the crime, including: (i) sources discussing the

---

[7] Yu cites Singh, 390 F.3d at 182 (finding nexus when the defendants "maintained billing and accounts payable records [related to the suspected fraud] at the Singh home"); United States v. Harvey, No. 21-cr-335 (SJ), 2022 WL 684050, at *7 (E.D.N.Y. Mar. 8, 2022) (finding nexus when the "attempted robbery and shooting . . . occurred outside [the defendant's] apartment"); United States v. Moran, 349 F. Supp. 2d 425, 478-79 (N.D.N.Y. 2005) (finding nexus when "people wait[ed] at the Snubbing Post [the searched location] to purchase methamphetamine").

business dispute between Yu and Gu,[8] (ii) sources disclosing meetings between Yu and coconspirators, and (iii) evidence of Yu paying coconspirators using cash and/or corporate transfers. (Ford Aff. ¶¶ 8-11, 19, 37-39, 50.) Second, there is probable cause to believe that evidence of the murder-for-hire crime could be discovered at Yu's residence, considering: (i) the warrant affidavit states that Yu keeps cash at home and would "bring cash from his residence to the office for certain payments," (Ford Aff. ¶ 6); (ii) common sense that "an individual engaged in a conspiracy may have evidence of that conspiracy, including telephone numbers and other contact information, located in his or her residence," United States v. Brown, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009); and (iii) the experience of Special Agent Donald Ford that the type of evidence sought by the warrant, such as electronic devices, "may remain accessible at the [searched premises]" despite "the passage of time since the murder," (Ford Aff. ¶ 52). See also United States v. Zaso, No. 22-cr-74 (LJV), 2023 WL 4011149, at *5 (W.D.N.Y. June 15, 2023) (finding nexus with the searched premises based in part on the FBI special agent's "experience investigating drug crimes . . . [and knowledge] that drug dealers often keep narcotics and other evidence of drug trafficking in their homes"); Disla Ramos, 2022 WL 17830637, at *12 (same). At oral argument, Yu argued that Amaco's business office would have been a better place to search for evidence related to his business. (Mar. 7, 2023 Hr'g Tr. 4:21-25.) That may be true, but this does not diminish the probability of also finding relevant evidence at Yu's home. For these reasons, I reject Yu's nexus argument.

---

[8] See supra note 6.

### b. Zhang

I next address Zhang's argument. Zhang argues that there is "no credible probable cause showing . . . to believe that there would be any evidence of a murder-for-hire crime on a telecommunications device of any kind in Mr. Zhang's residence in California in May 2022." (Zhang Mem. 9 (emphasis omitted).) I reject this argument for substantially the same reason as Yu's. First, the warrant affidavit provides even stronger probable cause to link Zhang to the murder-for-hire crime, including: (i) a source identifying Zhang as a criminal associate of You You, (ii) a source placing Zhang "within several blocks" of the crime scene "in the early hours of" the date when Gu was murdered, (iii) cell tower data placing Zhang within approximately 3.5 miles of the crime scene several times on the date of the murder, and (iv) evidence of financial payments from Yu to Zhang, (Lin Aff. ¶¶ 22, 25, 28, 39).[9] Moreover, the warrant affidavit proffers facts describing Zhang and his coconspirators' use of electronic devices and encrypted applications to communicate, including You You's use of a burner phone. (Id. at ¶¶ 22, 24, 27, 29.) Second, there is probable cause to believe that evidence of the murder-for-hire crime would be found at Zhang's residence in California, considering that the type of evidence sought (i.e., electronic devices) is likely to be maintained "months or even years after [the crime] occurred." Ray, 541 F. Supp. 3d at 375; see also Rodriguez, 2023 WL 3243213, at *9 (concluding that there is probable cause to search the defendant's home "even though [he] had moved to 120 Center Avenue only recently").

In opposition, Zhang argues that at least some of these proffered facts, "[s]tanding alone," do not "provide evidence rising to probable cause." (Zhang Mem. 7 n.1.) This argument misstates the law, which considers probable cause under the totality of the circumstances. Ray, 541 F. Supp.

---

[9] See also supra note 5 discussing communications between Zhang and You You.

3d at 402; see also Disla Ramos, 2022 WL 17830637, at *7 (upholding a search warrant even though "none of the evidence [regarding probable cause] standing alone was airtight"). Zhang also cites United States v. Lahey, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) and United States v. Falso, 544 F.3d 110 (2d Cir. 2008) as examples in which nexus was found to be lacking, (Zhang Mem. 9), but these cases are distinguishable. Lahey involves a case in which the nexus between the suspected crime and the searched property was more attenuated—there, officers sought to search one defendant's home on the basis that he had constructively possessed someone else's firearm, even though the warrant application did not explain why evidence of the crime would be found at that defendant's home. 967 F. Supp. 2d at 726 ("[T]he Government has not explained why the fact that Tarrats constructively possessed someone else's gun while he was on guard duty at Lahey's property creates probable cause to search Tarrats's home for guns, narcotics, or narcotics paraphernalia."). Falso involves a case in which there was simply no probable cause to link the defendant to the suspected crime in the first place. 544 F.3d at 113 (concluding that probable cause was lacking because the defendant "was not alleged to have actually accessed or subscribed to any child-pornography website," but affirming the district court's denial of the motion to suppress on the good-faith exception). For these reasons, I likewise reject Zhang's nexus argument.

### iii.    Nexus with Electronic Devices

Yu and Zhang next challenge probable cause with respect to the electronic devices seized. Specifically, Yu argues that there was insufficient nexus "between the suspected crime and '[a]ny electronic devices' that may have been in Mr. Yu's home." (Yu Mem. 29 (alteration in original).) Zhang argues that the Zhang Premises Warrant "allowed the government to indiscriminately seize and search 25 different electronic media devices—without establishing probable cause to believe

14

the seized materials would contain evidence of the offenses alleged." (Zhang Mem. 15.)[10] These arguments are unpersuasive.[11]

### a.   Yu

I first address Yu's argument. The Yu Premises Warrant sought to seize "[a]ny electronic devices, including computers, thumb drives, hard drives, cellular telephones, and/or other external storage devices." (Yu Premises Warrant ¶ 5.) Pursuant to the warrant, officers seized three iPhones, one iPad, one external hard drive, one DVR (digital video recorder), and two desktop computers. (Yu Mem. 10-12.) Yu argues that "[a] suspect's alleged use of a cellphone several times to further a crime does not provide reasonable cause to believe that any other electronic device associated with the suspect would contain evidence of the suspected crime." (Yu Mem. 29.) In support of this position, Yu cites a non-binding, out-of-circuit case, United States v. Nieto, in which the Court of Appeals for the Armed Forces held that a search warrant did not have probable cause to seize "all of an accused's electronic devices . . . merely because the accused used a cell phone in furtherance of a crime." 76 M.J. 101, 108 n.5 (C.A.A.F. 2017); (Yu Mem. 30-31).

As an initial matter, Nieto is distinguishable because the warrant affidavit in that case only identified cellphones as the relevant devices and "did not reference a laptop or data transfers from [the defendant's] cell phone." 76 M.J. at 107. By contrast, the Ford Affidavit extensively

---

[10] In his briefing, Zhang characterizes this argument as one going to overbreadth. (Zhang Mem. 15.) However, overbreadth refers to warrants whose "description of the objects to be seized is broader than can be justified by the probable cause upon which the warrant is based." United States v. Wey, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (citations and alterations omitted). Since Zhang is challenging the specific items seized, his argument is more appropriately one going to probable cause rather than overbreadth.

[11] In addressing both Defendants' arguments here, I consider the issue only with respect to the specific electronic devices seized and not some hypothetical device that could theoretically be outside the scope of probable cause. See Disla Ramos, 2022 WL 17830637, at *18 (denying without prejudice a motion to suppress when the defendant did not "present[] information that any non-cellphone electronic devices were seized," and therefore "there is no occasion for the Court to determine what relief, if any, [the defendant] might be entitled to as a result of any seizure of non-cellphone electronic devices").

documents the coconspirators' use of various electronic devices, including not only cellphones, but also a burner phone and encrypted applications like WeChat that individuals typically use on smart devices such as iPads.[12]  Additionally, the Ford Affidavit also describes the motive for the murder-for-hire crime as stemming from a business dispute between Yu and the victim as related to their work at Amaco, as well as corporate payments made by Yu to Zhang.  (Ford Aff. ¶¶ 8-11, 39.)  Given this context and considering that individuals typically maintain corporate documents on computers and their accessory items, plus allegations in the warrant affidavit that Yu uses computers to work from home, (id. ¶ 7), there is a likelihood of finding evidence of the murder-for-hire crime in the electronic devices seized.  See Disla Ramos, 2022 WL 17830637, at *15 (upholding a warrant to seize cellphones when the defendant "was in possession of a cellphone at the time of the robbery"); United States v. Burgos, No. 20-cr-182 (VEC), 2021 WL 3788962, at *10 (S.D.N.Y. Aug. 25, 2021) (upholding a warrant to seize electronic devices when the warrant affidavit sufficiently stated that "'individuals who engage in narcotics trafficking' often use cellphones or other electronic devices to maintain the contact information of their co-conspirators and to communicate with them").

### b.   Zhang

I now turn to Zhang's challenges.  The Zhang Premises Warrant sought to seize "[a]ny digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses," as well as "[r]ecords, documents, programs, applications or materials" from "any of the digital devices."  (Zhang Premises Warrant ¶¶ 1(m), (r).)  Pursuant to the warrant, officers seized twenty-five electronic devices, (Zhang Mem. 15), including ten iPhones, four cellphones, two iPads, three computers, and various accessory items such as SIM cards, (Zhang

---

[12] See supra note 5.

16

Evidence Log).  For substantially the same reason as my conclusion with respect to the Yu Premises Warrant, I conclude that the issuing magistrate had a substantial basis for finding probable cause to seize "any digital device" with respect to Zhang.  As already discussed, the linkage of the crime to Zhang is even stronger, including a source who "observed [Zhang] and another individual in a white sedan" "within several blocks of [the crime scene]."  (Lin Aff. ¶ 25.) The warrant affidavit also extensively discusses the conspirators' use of electronic devices.[13]  With respect to Zhang, the warrant affidavit proffers that (i) he communicated with You You during the crime and "contacted [You You] and reported that the murder occurred as planned," (ii) he contacted Abreu "after the murder" to say that he "left stuff in [the car]," and (iii) cell-site data placed Zhang "approximately 3.5 miles from the site of the murder" on the date of the crime. (Id. ¶¶ 26-28.)

Although the warrant affidavit does not support an inference that every device seized during the execution of the search warrant is necessarily connected to the murder-for-hire crime, the law does not require this level of precision, and "[t]he amount of information seized cannot itself establish that the seized information went beyond that permitted by the warrant."  Ray, 541 F. Supp. 3d at 395.  For electronic devices in particular, officers are not required to "remain at the premises [and] . . . methodically review[] each of the items of electronic media" to determine which of the iPhones, iPads, computers, or accessory items contain responsive evidence.  Id. at 393.  Instead, once the warrant affidavit "established probable cause to the satisfaction of the magistrate that electronic media at the [searched premises] would likely contain evidence . . . of the subject offenses," the government may seize these devices "before [their] content is known

---

[13] See supra note 5.

and then search[] at a later time." Id. (citation omitted).  For these reasons, I likewise reject

Zhang's argument here.

<h3 style="text-align:center">iv.    <strong>Corroboration</strong></h3>

Yu (but not Zhang) next argues that the Yu Premises Warrant lacks probable cause because

the statements given by Witness-1, Witness-2, and CW-1 are "substantively deficient" due to lack

of corroboration.  (Yu Mem. 18-27.)

"When assessing the existence of probable cause based on an informant's information, 'the

core question . . . is whether the information is reliable.'"  United States v. McKenzie, 13 F.4th

223, 237-38 (2d Cir. 2021) (quoting Wagner, 989 F.2d at 72).  Reliability may be shown if the

informant "has a track record of providing reliable information," or if his information "is

corroborated in material respects by independent evidence."    Wagner, 989 F.2d at 72-73.

Corroboration, however, is "an 'assessment of probabilities,'" United States v. Canfield, 212 F.3d

713, 720 (2d Cir. 2000) (quoting Gates, 462 U.S. at 232), and the government is not required to

corroborate every statement made by the informant.  "If a substantial amount of information . . . is

shown to be reliable," then the issuing magistrate may infer that "the informant is reliable and that

therefore other information that he provides, though uncorroborated, is also reliable."  Wagner,

989 F.2d at 73.  In this case, the government has met its burden.

I begin with Witness-1 and Witness-2, who are former employees of Amaco.  (Ford Aff.

¶ 6 nn.1-2.)  First, since neither witness received any benefits in exchange for their information,

(id.), they are akin to "innocent bystander[s]" with "no apparent motive to falsify."  United

States v. Gagnon, 373 F.3d 230, 236, 238 (2d Cir. 2004) (citing Caldarola v. Calabrese, 298 F.3d

156, 163 (2d Cir. 2002)).  Second, much of the information offered by these two witnesses may be

"first-hand observations" that are generally considered reliable.    Wagner, 989 F.2d at 73

(concluding that an informant may be reliable if his or her information is derived from "reliable

18

means, such as first-hand observations"). This includes the witnesses' observations regarding Amaco's business practice of paying laborers in cash, Yu's practice of using electronic devices while working remotely at home, or Gu's position within the company. (See, e.g., Ford Aff. ¶¶ 6-8.)[14] Third, importantly, in an interview with the police, Yu himself corroborated some of the information provided by these two witnesses, including his ownership of Amaco, his relationship with Gu, his view that Gu is "a good worker," and Gu's ultimate departure from Amaco to start a competing business in 2018. (D.E. # 82, Ex. B (Interview with Yu).) Fourth, the allegation that Yu had a business dispute with Gu was also independently corroborated by a third source. (Ford Aff. ¶ 19 (stating, according to CW-1, that when Gu "left [Yu's] company, a number of clients terminated their contracts with [Yu] to work with [Gu]," and those contracts "were worth several million dollars").)

The analysis is stronger with respect to CW-1, who is an alleged coconspirator. (Ford Aff. ¶¶ 19 & n.5, 22.) Yu argues that CW-1 has "no history of providing reliable information." (Yu Mem. 24.) However, there is "no need to show past reliability when the informant . . . is in fact a participant in the very crime at issue." Gagnon, 373 F.3d at 236 (alteration in original) (quoting United States v. Jackson, 560 F.2d 112, 121 (2d Cir. 1977)). In this case, CW-1 was allegedly at the crime scene on the night of the murder, observing the shooting with You You in a white van. Independent evidence also corroborates CW-1's statements, including: (i) CW-1's ability to identify Zhang as a coconspirator, (ii) Enterprise records verifying that You You rented a white van on the date prior to the murder, and (iii) cell-site location records placing CW-1 and You You in the vicinity of the crime scene shortly before Gu was killed. (Ford Aff. ¶¶ 21-23 & n.7.)

---

[14] Yu urges me to disregard Paragraphs 9 and 13 of the Ford Affidavit because they did not explicitly cite to any sources. (Yu Mem. 20.) I decline to do so, since it is clear from the structure and context of the warrant affidavit that those two paragraphs rely on Witness-1 and Witness-2.

Yu's counterarguments here are unpersuasive.  First, Yu argues that the warrant affidavit relies on "unreliable multiple hearsay."  (Yu Mem. 20.)  However, it is settled law that "[a] judge evaluating the adequacy of a search warrant application may consider hearsay, including the hearsay statements of a confidential informant, in determining the existence of probable cause." United States v. Harding, 273 F. Supp. 2d 411, 418 (S.D.N.Y. 2003).  Second, Yu argues that the "more damaging allegations" in the warrant affidavit are not corroborated.  (Yu Reply 8.) However, "no case law . . . suggest[s] that information can be considered corroborative only if it reveals incriminating information."  United States v. Bimbow, No. 21-cr-48 (JPO), 2022 WL 715359, at *3 (S.D.N.Y. Mar. 10, 2022); see also Canfield, 212 F.3d at 720 (noting that corroborating the "innocent details" may yield "a higher probability [that] the incriminating facts are true").  Third, Yu points out several inconsistencies in the witnesses' statements, such as the amount of revenue that Gu brought in or the manner in which Yu compensated Zhang.  (Yu Mem. 22, 26-27.)  However, probable cause is "not defeated because the informant erred, or even lied, in his description of events" as long as the warrant applicant "accurately represents the information provided by the informant."  United States v. Smith, 9 F.3d 1007, 1014 (2d Cir. 1993).

Ultimately, probable cause is a "fluid concept [] turning on the assessment of probabilities," Falso, 544 F.3d at 117 (quoting Gates, 462 U.S. at 232), "not a prima facie showing of criminal activity," Travisano, 724 F.2d at 346.  Thus, according "substantial deference" to the issuing magistrate's probable-cause finding, Wagner, 989 F.2d at 72, I reject Yu's corroboration argument.

### B.    Overbreadth and Particularity

Both Yu and Zhang next argue that the Premises Warrants are overbroad and/or lacking in particularity.

"[B]readth and particularity are related but distinct concepts."  United States v. Ulbricht, 858 F.3d 71, 102 (2d Cir. 2017), abrogated on other grounds, Carpenter v. United States, 138 S.

Ct. 2206 (2018).  A warrant is overbroad if "its description of the objects to be seized is broader than can be justified by the probable cause upon which the warrant is based."  Wey, 256 F. Supp. 3d at 382 (citations and alterations omitted); see also United States v. Zemlyansky, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013) ("In determining whether a warrant is overbroad, courts must focus on 'whether there exists probable cause to support the breadth of the search that was authorized.'" (citation omitted)).  Particularity, by contrast, requires a warrant to "particularly describe[e] the place to be searched, and the persons or things to be seized."  United States v. Galpin, 720 F.3d 436, 445 (2d Cir. 2013) (quoting U.S. Const. amend. IV.).  To satisfy particularity, a warrant must (i) "identify the specific offense for which the police have established probable cause," (ii) "describe the place to be searched," and (iii) "specify the items to be seized by their relation to designated crimes."  Wey, 256 F. Supp. 3d at 380 (quoting Galpin, 720 F.3d at 445-46).

### i.    Yu

I begin with Yu's argument.  Yu argues that the warrant is overbroad because it (i) "authorize[d] a review of any and all contents to be found on Mr. Yu's cellphone and 'any [other] electronic devices,'" (ii) "authorized the seizure and review of all business records for any company with which Mr. Yu was associated," and (iii) "authorized the search of items that were temporally irrelevant to the investigation."  (Yu Mem. 32-35 (citations omitted).)  This argument is unpersuasive.[15]

---

[15] Yu also makes a half-hearted argument that the warrant does not "set any limits on what the Government was required to do with the information that they collected and searched, but did not 'seize.'"  (Yu Mem. 35 (citation omitted).)  In support, Yu cites United States v. Shipp, 392 F. Supp. 3d 300 (E.D.N.Y. 2019).  Shipp is inapplicable here.  First, Shipp concerns a warrant to search a specific type of digital evidence—there, a Facebook account, which is distinguishable from a more typical warrant to search a suspect's physical home for hardware devices.  Id. at 303.  Second, Shipp acknowledged that, even with respect to the type of digital evidence at issue there such as a Facebook profile, the Second Circuit has yet to impose any "rigid requirement."  Id. at 311 (citing Galpin, 720 F.3d at 451).  More importantly, Yu's argument fails because he points to no evidence that the government in this case has in fact improperly kept any electronic devices.  To the contrary, the government has made certain items available for return after determining that they do not have any evidentiary value.  (See, e.g., Gov't Let. Jan. 19, 2023, at 2); see United States v. Zottola, No. 18-cr-609 (HG), 2022 WL 3682222, at *3 (E.D.N.Y. Aug. 25, 2022) (noting favorably that

First, a warrant does not become overbroad for having the phrase "any electronic devices." Yu cites Galpin, a Second Circuit opinion cautioning that a warrant broadly permitting the search of electronic devices may open the door for the government to argue that everything it "chose to open [was] in plain view." 720 F.3d at 447; (Yu Mem. 33). However, the Second Circuit has since emphasized that "Galpin does not hold that the use of the phrase 'any and all' in a warrant is impermissible." United States v. Romain, 678 F. App'x 23, 26 (2d Cir. 2017) (summary order). Instead, a warrant becomes overbroad when it permits the seizure of items "wholly unrelated" to the offense for which the government has probable cause, or if it fails to provide "'any guidance . . . as to what kind of [electronic] files' should be seized." Id. (citations omitted). In this case, the electronic devices to be seized are not "wholly unrelated" to the murder-for-hire crime, as the warrant affidavit describes in detail Yu and his coconspirators' practice of communicating using electronic devices, a burner phone, and encrypted applications, as well as hiding payments through digital corporate transactions.[16]  (Ford Aff. ¶¶ 20, 24-25, 27, 35-36, 39.) The warrant also specifies the types of files and/or data that may be seized, such as email contacts, instant messaging logs, usernames and passwords, among others. (Yu Premises Warrant, ¶ 5(a)); cf. Romain, 678 F. App'x at 26 (finding that the warrant was not overbroad when it specified the "kinds of files" to be seized from the cellphones, such as "call log information," "voicemails," and "the content of 'apps,'" among others).

Second, the Yu Premises Warrant is not overbroad for authorizing the search of business records for "any company" associated with Yu. As already discussed, the warrant affidavit alleges

---

"after executing the warrants . . . , the government narrowed its review of [the defendant's] property" and "informed [him] that it intended to introduce evidence from [only] seven [of the nineteen] devices at trial").

[16] See supra note 5 discussing the conspirators' use of electronic devices.

that the motive for the underlying crime originated with a business dispute with the victim.[17] Moreover, the warrant affidavit describes the conspirators' practice of hiding payments through corporate financial transactions, including the checks issued by Yu's company (517 Management) to Zhang's company (Jetspeed Marketing Inc.). (Ford Aff. ¶ 39.) Accordingly, there is probable cause for officers to search broadly any business records associated with Yu for possible evidence of motive and payment between the conspirators. See United States v. Hernandez, No. 09-cr-625 (HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010) (upholding a "fairly broad" warrant when "the affidavit in support of the search warrant application provides the necessary basis for a determination of probable cause"). Additionally, the Yu Premises Warrant has two important limitations: it expressly identifies the crime being investigated and specifies a temporal limitation of either "August 15, 2018 to present" or "January 1, 2011 to present." (Yu Premises Warrant, ¶ 1.) Thus, although officers may broadly seize business records of "any company" associated with Yu, they may search only for evidence of a limited subject matter for a limited time-period. These limitations distinguish the Yu Premises Warrants from those that have been found to be overbroad. Cf. Wey, 256 F. Supp. 3d at 384-86 (invalidating search warrants that failed to "set forth the crimes under investigation" and included "expansive categories of often generic items subject to seizure . . . without . . . any linkage to the suspected criminal activity"); In re 650 Fifth Ave. and Related Props., 830 F.3d 66, 84, 100 (2d Cir. 2016) (finding that a search warrant that failed to "identify the crimes for which agents were authorized to search or seize" lacked particularity).[18]

---

[17] See supra note 6.

[18] In addressing Yu's argument here, I do not consider the "all records" exception, since the government stated that it is not seeking to invoke this doctrine. (Yu Mem. 33-34; Gov't Opp'n 30 n.9.)

23

Third, the temporal limitation is appropriate and does not render the Yu Premises Warrant overbroad. As an initial matter, "case law is hardly uniform as to when, if at all, the absence of a time frame would violate the overbreadth prong of the Fourth Amendment." United States v. Cohan, 628 F. Supp. 2d 355, 365 (E.D.N.Y. 2009); see also United States v. Triumph Cap. Grp., Inc., 211 F.R.D. 31, 58 (D. Conn. 2002) ("A temporal limitation in a warrant is not an absolute necessity, but is only one indicia of particularity. . . . Thus, the absence of a temporal limitation does not render the warrant a prohibited general warrant." (citations omitted)). District courts have typically invalidated a warrant only when it failed to specify any temporal limitation. Compare Wey, 256 F. Supp. 3d at 387-88 (invalidating search warrants that did not include "any relevant timeframe or dates of interest"), and In re 650 Fifth Ave., 830 F.3d at 100 (finding that a search warrant that did not "particularize . . . the temporal scope of the materials that could be seized" lacked particularity), with United States v. DiScala, No. 14-cr-399 (ENV), 2018 WL 1187394, at *17 (E.D.N.Y. Mar. 6, 2018) (upholding the search warrant that "contained a definite temporal limitation"). Here, the Yu Premises Warrant has two temporal limitations, both of which are reasonable. It specifies, for documents related to Amaco and 517 Management Inc.—i.e., the entity through which Yu allegedly paid Zhang, (Ford Aff. ¶ 39)—a time period of "January 1, 2011 to present," and for all other documents, an even shorter time period of "August 15, 2018 to present." (Yu Premises Warrant ¶ 1.) The issuing magistrate had a substantial basis for concluding that there was probable cause of finding relevant evidence in these timeframes. The longer timeframe, which begins just four years before Gu allegedly started working for Yu in 2015, (Ford Aff. ¶ 6), may provide context to understand the relationship between Yu and the victim, such as the relative magnitude of business that Gu brought in. The shorter timeframe, which begins in the

24

month that Gu allegedly left Amaco, (id. ¶ 9), is certainly relevant as a possible originating point for the crime's motive. For these reasons, I reject Yu's overbreadth argument.

### ii.   Zhang

I also do not find persuasive Zhang's argument that the Zhang Premises Warrant is (i) overbroad for having "temporal limitations . . . untethered to the probable cause showing," and (ii) lacking in particularity because it does not specify "date ranges, particular individuals, suspected accomplices, specific subject matter, or particularized electronic items."[19] (Zhang Mem. 15-17.)

First, the temporal limitation specified in the Zhang Premises Warrant ("August 15, 2018 to present") is appropriate. (Zhang Premises Warrant ¶ 1.) As already discussed, a warrant will ordinarily be upheld where at least some temporal limitation is specified. See DiScala, 2018 WL 1187394, at *17. Zhang argues that this period is overbroad because it includes the "nearly two-year period from April 2020 to May 2022, for which there is actually no information included in the [warrant] affidavit." (Zhang Mem. 17.) This argument is incorrect, as the warrant affidavit provides at least one example of possible criminal activity that post-dates April 2020—a conversation between a coconspirator and a third party dated September 21, 2021 regarding possible payments for the crime. (Lin Aff. ¶ 41.) Moreover, it is reasonable for the issuing magistrate to infer that relevant evidence of the murder-for-hire crime may still be found even after the murder has been completed, including money transfers, attempts to hide evidence, or discussions regarding the crime. See Travisano, 724 F.2d at 346 (describing probable cause as a "probability" and "not a prima facie showing of criminal activity").

---

[19] Zhang also argues that the warrant is "overbroad because it allowed the government to indiscriminately seize and search 25 different electronic media devices." (Zhang Mem. 15.) This is more appropriately an objection to probable cause rather than to overbreadth, which I have already addressed supra in Section I(A)(iii).

Second, the Zhang Premises Warrant also meets the particularity requirement. Contrary to Zhang's representation, the Zhang Premises Warrant specifies the crime, the suspected accomplices, the specific subject matter, and the specific items to be seized. For example, the warrant authorizes the searches of:

    a. All records and information relating to a conspiracy to murder Xin Gu and the murder of Gu among co-conspirators, including ALLEN YU, YOU YOU and ANTONY ABREU;

    b. All records and information of association and/or communication with co-conspirators, including ALLEN YU, YOU YOU and ANTONY ABREU, in furtherance of the Subject Offenses or evidence of the relationship among co-conspirators;

    c. All records and information concerning payment to and from co-conspirators, including ALLEN YU, YOU YOU and ANTONY ABREU;

(Zhang Premises Warrant ¶¶ 1(a)-(c).) These categories are "not open-ended" and contain sufficient "terms limiting their scope" to meet the particularity requirement. Zottola, 2022 WL 3682222, at *2 (upholding a similarly phrased search warrant); see also Ray, 541 F. Supp. 3d at 389 (rejecting the defendant's particularity argument when the premises search warrant "limits the agents to seize items only if they are related to the Subject Offenses"). For these reasons, I likewise reject Zhang's argument on overbreadth and particularity.

## C.    Good Faith

Although I conclude that the Premises Warrants are sufficiently supported by probable cause and are not overbroad or lacking in particularity, I also find in the alternative that suppression is inappropriate in this case due to the good-faith exception. See, e.g., Ray, 541 F. Supp. 3d at 395 (rejecting the defendant's argument challenging the premises search warrant but also reaching the good-faith exception in the alternative).

Generally, "[a] violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010).

Instead, whether a district court should exclude evidence seized pursuant to a defective warrant "depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" Id. (quoting United States v. Julius, 610 F.3d 60, 66-67 (2d Cir. 2010)).  In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court identified four circumstances in which the good-faith exception would not apply, including:  (i) the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (ii) the issuing magistrate "wholly abandoned" his or her judicial role; (iii) the warrant application is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and (iv) the warrant is so "facially deficient" that officers "cannot reasonably presume it to be valid." United States v. Jones, 43 F.4th 94, 111 (2d Cir. 2022) (quoting Leon, 468 U.S. at 923).  The government bears the burden to demonstrate that good faith applies. Disla Ramos, 2022 WL 17830637, at *11.

Here, none of the four circumstances is present, and two separate magistrate judges in two districts reviewing substantially the same search warrant came to the same conclusion about their constitutionality.  Defendants' counterarguments are unavailing.  Both Yu and Zhang primarily base their arguments on the same issues already discussed—staleness, nexus, corroboration, overbreadth, and particularity.  (Yu Reply 20-22; Zhang Reply 10-11.)  I therefore adopt my analysis in the prior sections and reject these arguments on the same basis.

Yu raises one additional argument—that the government failed to meet its burden by not discussing how the good-faith factors in United States v. Rosa apply in this case.  (Yu Reply 23 (citing Rosa, 626 F.3d 56).)  This argument is also unpersuasive.  In Rosa, the Second Circuit found that the search warrant at issue "lacked the requisite specificity to allow for a tailored search

of [the defendant's] electronic media," but upheld the denial of the defendant's suppression motion on the good-faith exception.  626 F.3d at 62, 66.  In its analysis, the Second Circuit considered the specific facts in that case and concluded that the "exclusionary rule would serve little deterrent purpose in this case."  Id. at 65.  In reaching this conclusion, the Second Circuit observed that the officers had acted under "time pressure," that the failure to include greater specificity in the warrant was an "inadvertent error," that no evidence suggested "deliberateness and culpability on the officers' part," and that no evidence indicated that the officers "actually relied on the defective warrant" and seized "any items that were unrelated to the crimes for which probable cause had been shown."  Id. at 65-66.  In short, Rosa involved a facially deficient search warrant, but the officers executing it "proceeded as though the limitations contemplated . . . were present in the warrant itself."  Id. at 66.  Rosa did not create a new four-factor test that the government must analyze in every good-faith argument.  Neither is Rosa directly applicable to this case, since the Premises Warrants are not facially defective.

Accordingly, considering that "exclusion has always been our last resort, not our first impulse," id. at 64 (quoting Herring v. United States, 555 U.S. 135, 140 (2009)), I conclude in the alternative that good faith applies to the Premises Warrants.

### D.    **Franks** Hearing

Yu (but not Zhang) also moves for a Franks hearing based on four alleged material misrepresentations and/or omissions in the Ford Affidavit.  (Yu Mem. 37-41.)  This motion is denied.

In Franks v. Delaware, the Supreme Court held that, although warrant affidavits have a "presumption of validity," a defendant may in some circumstances "challenge the truthfulness of factual statements made in an affidavit supporting the warrant" by seeking an evidentiary hearing.  438 U.S. 154, 155-56, 172 (1978).  However, "[t]he burden to obtain such a hearing is a heavy

one, and such hearings are exceedingly rare." United States v. Melendez, No. 16-cr-33 (LTS),

2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016). A defendant seeking a Franks hearing must:

> make a substantial preliminary showing that (1) there were intentional
> misrepresentations or omissions in the warrant affidavit, . . . [i.e.,] 'the claimed
> inaccuracies or omissions are the result of the affiant's deliberate falsehood or
> reckless disregard for the truth' [("the intentionality prong")]; and  (2) those
> misrepresentations or omissions were material, or 'necessary to the issuing judge's
> probable cause finding [("the materiality prong")].'

United States v. Nejad, 436 F. Supp. 3d 707, 718-19 (S.D.N.Y. 2020) (quoting United States v.

Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013)). Regarding the intentionality prong, a defendant

must present "credible and probative evidence" that a misstatement or omission was "designed to

mislead" or "made in reckless disregard of whether it would mislead." Rajaratnam, 719 F.3d at

154 (citation omitted). Regarding the materiality prong, a district court "should disregard the

allegedly false statements, insert the omitted truths, and determine whether there remains a residue

of independent and lawful information sufficient to support probable cause." Nejad, 436 F. Supp.

3d at 719 (citation omitted).

Yu alleges four material misrepresentations or omissions. First, Yu alleges that CW-1 gave

inconsistent statements in two separate warrant affidavits. (Yu Mem. 39; compare Ford Aff. ¶¶ 19-

21, 38, with D.E. # 82, Ex. D ("Prior Affidavit") ¶ 19.)[20] Specifically, in the Prior Affidavit, CW-

1 was cited for the statement that "shortly after the shooting, [You You] confessed that his uncle

[Yu] had instructed [You You] to kill a former employee in exchange for $50,000."  (Prior

Affidavit ¶ 19.) In the Ford Affidavit, CW-1 was cited for a longer statement, including additional

allegations, such as meetings with Yu and You You before the shooting and a conversation with

---

[20] The Prior Affidavit was filed by FBI Special Agent Christopher Lin in support of two search warrants
issued on May 3, 2021 by Magistrate Judge Peggy Kuo, authorizing the search of "records and information" of four
cellphone numbers. (D.E. # 82, Ex. D (Cellphone Search Warrants).)

You You after the shooting "in early 2020," in which You You allegedly told CW-1 that Yu "had paid [You You] twice for the murder, including a second payment of $50,000." (Ford Aff. ¶¶ 19, 38.) CW-1's statements here are not inconsistent, and to the contrary, both affidavits consistently proffered that Yu paid You You $50,000. The fact that the Ford Affidavit discloses more information does not entitle Yu to a Franks hearing, as an investigating officer has "no obligation to disclose all of the facts gleaned from his investigation at the time he applie[s] for the [w]arrants." United States v. Garlick, No. 22-cr-540 (VEC), 2023 WL 2575664, at *8 (S.D.N.Y. Mar. 20, 2023).

Second, Yu alleges that the Ford Affidavit gave "false impression" that "all of CW-1's information had been independently corroborated," citing a footnote in the warrant affidavit.[21] (Yu Mem. 39 (citing Ford Aff. ¶ 19 n.5).) However, nowhere does the Ford Affidavit state that "all" of CW-1's statements are corroborated, and the government does not make this representation in its briefing. (Gov't Opp'n 39.) Neither is the government required to do so, since "if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration." Wagner, 989 F.2d at 73. As already discussed, I rejected Yu's argument that the Ford Affidavit is substantively deficient with respect to corroboration.[22]

Third, Yu alleges that the Ford Affidavit deliberately omitted information that Witness-1 was a "disgruntled employee" and that Witness-2 was "close friends [with Gu]," and these witnesses therefore "harbored animosity towards Mr. Yu." (Yu Mem. 40.) As an initial matter, "[o]missions are not subject to the same high level of scrutiny as misstatements," since

---

[21] The relevant footnote reads: "CW-1's information has been corroborated by other information and my investigation, including by other witnesses, cell-site records, surveillance video and physical surveillance." (Ford Aff. ¶ 19 n.5.)

[22] See supra Section I(A)(iv).

"affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct." United States v. Rivera, 750 F. Supp. 614, 617 (S.D.N.Y. 1990) (citation omitted).  More importantly, this omission is not material to a finding of probable cause. Even if this information is inserted into the warrant affidavit, a "substantial amount of information" provided by Witness-1 and Witness-2 was either reliable as "first-hand observations" or corroborated independently by other witnesses, including by Yu himself.[23]  Wagner, 989 F.2d at 73.

Fourth, Yu alleges that Witness-1's statement regarding Gu's compensation (allegedly $135,000) and his contribution to Amaco's business (allegedly $30 million) in 2017 are inconsistent with financial records showing a lesser amount.  (Yu Mem. 40.)  In opposition, the government explains that the alleged compensation reflects "salary and bonus" and that the $30 million figure reflects "revenue over the course of his employment with Amaco, not just in 2017." (Gov't Opp'n 41.)  Although the government effectively concedes that the Ford Affidavit overstated Gu's contribution to Amaco's revenue in 2017, this misstatement is not material, as it does not change the essential point that Gu was a high performer at Amaco and that his departure from Yu's employment may have provided a motive for the crime.  Moreover, the information regarding Gu's performance and later departure is also corroborated by other sources, including by CW-1.  (Ford Aff. ¶ 19); see also Garlick, 2023 WL 2575664, at *8 (denying the defendant's motion for a Franks hearing in part because "other evidence regarding Defendant's online activity . . . was sufficient to make the same point").

---

[23] See supra Section I(A)(iv) rejecting Yu's argument that Witness-1 and Witness-2 provided insufficiently corroborated information.

### E.    Zhang's Other Offenses

Finally, Zhang argues that there is no probable cause to find evidence of the narcotics offense and witness retaliation. (Zhang Mem. 10-14.) I address each in turn.

#### i.    Narcotics Offense

Regarding the narcotics offense, Zhang argues that the Lin Affidavit "relies on outdated and untimely information," i.e., that the information in the warrant affidavit is stale. (Zhang Mem. 12.) I agree.

The entirety of evidence supporting the narcotics offense consists of four paragraphs in the Lin Affidavit, including:  (i) statements by CW-3 that he has purchased marijuana from Zhang "every month" from "2016 or early 2017 until at least 2020"; and (ii) three Instagram messages between Zhang and Abreu discussing drug sales dated from August 28, 2018 to April 12, 2020. (Lin Aff. ¶¶ 42-45.) Although the proffered statement suggests that Zhang has been involved in narcotics distribution for approximately three years from 2017 to 2020, nothing in the affidavit connects Zhang to any narcotics activity in 2022, when the search took place.

As discussed previously, staleness depends on the passage of time, the kind of property sought, and the nature of the criminal activity. Singh, 390 F.3d at 181-82. Here, all three factors weigh against the government. The type of evidence sought, drugs, is consumable and likely to disappear with time. See, e.g., Saenz, 2022 WL 17961205, at *4-5. Significant time has also passed—over two years—between the last alleged criminal activity (April 12, 2020) and the date of the warrant application (May 9, 2022), (Lin Aff. ¶ 45; Gov't Opp'n 5), well beyond the "modest time lag" in other similar cases. United States v. Bongiovanni, No. 19-cr-227 (JLS), 2023 WL 3723265, at *6 (W.D.N.Y. May 30, 2023); see also Reyes, 922 F. Supp. at 827 (suggesting that "the information necessary to support a finding of probable cause should be no older than one year"). Although the passage of time is "less significant" where "the criminal activity is suspected

32

to be ongoing," United States v. Gayle, No. 08-cr-1244, 2009 WL 4667093, at *3 (S.D.N.Y. Dec. 8, 2009) (citation omitted), nothing in the Zhang Premises Warrant suggests that Zhang continued his narcotics operation past 2020.  This case is analogous to United States v. Kortright, in which a district court likewise found the information supporting a warrant to be stale when the affidavit relied on "[narcotics] transactions that were over a year old to infer the presence of contraband in the [defendant's] [a]partment."  No. 10-cr-937 (KMW), 2011 WL 4406352, at *7-9 (S.D.N.Y. Sept. 13, 2011) (upholding, however, the search warrant on the basis of the good-faith exception).  Here, without more recent evidence showing that Zhang continued to sell narcotics near the time of the search, the information in the warrant is stale.  Cf. United States v. Sarnelli, No. 22-cr-116 (NRB), 2023 WL 199659, at *9 (S.D.N.Y. Jan. 17, 2023) (upholding a warrant that relies on evidence "spanning two years," because the older evidence was "corroborated through location monitoring and video and physical surveillance during the two months prior to [the defendant's] arrest").

Additionally, the Zhang Premises Warrant is also deficient in showing sufficient nexus to the premises searched.  Nothing in the warrant affidavit connects any allegations of narcotics activities to Zhang's California home.  Indeed, the government conceded on the record that Zhang's California residence was not "connected to any of the dealings in marijuana." (Jan. 12, 2023 Hr'g Tr. 6:21-24.)  Essentially, the warrant affidavit postulates that there is a likelihood of finding narcotics evidence at Zhang's California home because he had dealt drugs approximately two years prior at some other location.  Without more, this theory, based almost entirely on the FBI agent's opinion, is insufficient for probable cause.  Cf. United States v. Benevento, 836 F.2d 60, 71 (2d Cir. 1987) (holding that, although "a government agent's expert opinion . . . 'is an important factor to be considered by the judge' when making a probable cause

determination," that opinion, "standing alone, might not be sufficient to establish a link between [the premises searched] and [the defendant's] prior criminal activity" (citations omitted)), abrogated on other grounds, United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989).

Further, the good-faith exception does not apply to save the warrant here. As discussed, cases establishing the staleness doctrine—as in Raymonda—have been "on the books" since 2015. United States v. Cioffi, 668 F. Supp. 2d 385, 397 (E.D.N.Y. 2009) (rejecting the government's argument to apply the good-faith exception when the relevant Supreme Court opinion "has been on the books since 2004"). This is not a case where the "relevant legal deficiency 'was not previously established in precedent.'" Raymonda, 780 F.3d at 119 (citation omitted). Although officers may generally rely on an issuing magistrate's grant of a search warrant, United States v. Clark, 638 F.3d 89, 103-04 (2d Cir. 2011), "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble," United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996). Additionally, as noted previously, the government bears the burden to demonstrate good faith. Disla Ramos, 2022 WL 17830637, at *11. In this case, other than a one-page discussion that primarily restates the legal rule, the government's opposition paper does not explain why good faith should apply with respect to the narcotics offense. For this reason, I find that the government has not met its burden to apply the good-faith exception. I therefore exclude all evidence seized pursuant to the narcotics offense, including evidence of marijuana.[24]

---

[24] My finding here does not warrant striking down the Zhang Premises Warrant wholesale. In Galpin, the Second Circuit held that an infirm section of a search warrant may be severed if the non-infirm clauses are "sufficiently particularized and supported by probable cause," as well as "distinguishable from the nonvalid parts." 720 F.3d at 448-49. Here, the narcotics offense constitutes a small portion of the overall warrant, which is focused primarily on the murder-for-hire crime. Because I have already upheld the Zhang Premises Warrant as applied to that crime, see supra Section I(A), I will sever the infirm provision with respect to the narcotics offense and suppress only the evidence seized pursuant thereto. See United States v. George, 975 F.2d 72, 79 (2d Cir. 1992). Moreover, I do not consider whether another exception applies, such as plain view, since the government did not raise that argument. See United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999) (holding that the government bears the burden to show that the plain-view exception applies).

### ii.    **Witness Retaliation**

Regarding the witness-retaliation offense, Zhang argues that the Lin Affidavit "does not provide enough probable cause evidence to believe that Mr. Zhang was involved in such a crime, let alone that there would be evidence of it at his Arcadia, California home in May 2022." (Zhang Mem. 10.) I disagree.

The warrant affidavit proffers four statements made by Zhang that constitute evidence of witness retaliation. Allegedly, after Abreu was convicted by a jury of a narcotics offense in the Southern District of Mississippi, Zhang posted on Instagram the following:

(1)    In September 2021, in response to Abreu's Instagram Story[25] featuring his co-defendant in the Mississippi case and calling him a "snitch," Zhang replied in a comment: "Let's get it !! #freethereal #fuckrats #ratsburninhell #bitchassnigga !! You know who you are Ha Ha."

(2)    For that same Instagram Story, another user commented "7 feet," which Special Agent Christopher Lin understood "to refer[] to someone being dead and buried," and Zhang replied to that comment: "I wish lol."

(3)    In December 2021, Zhang posted a photograph with a caption that was identical to his first statement ("Let's get it !! #freethereal #fuckrats #ratsburninhell #bitchassnigga !! You know who you are Ha Ha."), although the warrant affidavit does not specify what is on the photograph.

(4)    In April 2022, Zhang posted a photograph of a news story featuring someone who has the same last name as Abreu's co-defendant in the Mississippi case, and Zhang captioned: "That . . . rat [co-defendant's first name and last name] dad."

(Lin Aff. ¶ 46.)

The witness-retaliation offense has three elements: (i) "the defendant engaged in conduct that caused or threatened a witness with bodily injury," (ii) "the defendant acted knowingly, with the specific intent to retaliate against the witness for information the witness divulged to law enforcement authorities about a federal offense," and (iii) "the officials to which the witness

---

[25] "Instagram Stories is a feature by which a message or photo can be viewed by followers for a period of 24 hours, after which the Story disappears." Watson v. NY Doe 1, 439 F. Supp. 3d 152, 157 n.2 (S.D.N.Y. 2020).

divulged information were federal agents." Draper, 553 F.3d at 180. To show probable cause, the government need not present "evidence of every element of a crime." Ganek v. Leibowitz, 874 F.3d 73, 86 (2d Cir. 2017). Where a warrant affidavit sufficiently describes the suspect's conduct with respect to the "actus reus elements of the crime," an insufficient showing of the mens rea element will not defeat probable cause. Id. ("[T]he law is particularly tolerant with respect to the mens rea element of a crime on a probable cause showing.").

Here, I find that the issuing magistrate had a substantial basis to find probable cause. Zhang's statements here are similar to those of other cases in which the district court declined to dismiss an indictment on the basis of factual insufficiency. Where alleged conduct involves social media postings, courts are generally required to determine whether the statements constitute "true threats" that are not protected by the First Amendment. United States v. Ward, No. 17-cr-171, 2019 WL 6255198, at *9 (D. Conn. Nov. 22, 2019). In the Second Circuit, the test for whether a statement is a true threat is "objective," i.e., "whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury." Id. (alteration omitted) (quoting United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013)).[26] Applying this test, district courts have found statements similar to Zhang's to meet the actus reus element of witness retaliation or at least to present a sufficient factual basis for the prosecution to continue. See, e.g., Ward, 2019 WL 6255198, at *10-11 (finding that the defendant's Facebook comments accusing the victim of "snitching," combined with the defendant's "history of and a reputation for violence," constituted a true threat); United States v. McClain, No. 19-cr-40A, 2019

---

[26] I note that the Supreme Court recently clarified in Counterman v. Colorado that the First Amendment imposes a mens rea requirement—specifically, recklessness—on true-threat offenses. 143 S. Ct. 2106, 2111 (2023). Counterman does not change the analysis here, since the federal witness retaliation statute has a mens rea element of specific intent, Draper, 553 F.3d at 180, and in any event, "probable cause does not demand evidence of every element of a crime," Ganek, 874 F.3d at 86.

WL 8955241, at *3-5 (W.D.N.Y. Dec. 9, 2019) (rejecting the defendant's argument that her Facebook post—"This Bitch took the stand on my cuz and told lies just for her to get 20 years, kill all rats"—was not a true threat and denying her motion to dismiss indictment), report and recommendation adopted, 2020 WL 1503227 (Mar. 30, 2020).

In this case, Zhang's statements are comparable. First, it is unambiguous that Zhang made his statements against Abreu's co-defendant in the Mississippi case—all four statements were either in response to Abreu's Instagram post or explicitly identifying the co-defendant. Second, Zhang's statements ("Let's get it !!") and his calling Abreu's co-defendant a "rat" could be reasonably interpreted as going to "get" (i.e., beat or kill) the "rat" in that case. Third, Zhang explicitly wrote "#fuckrats" and "#ratsburninhell," which are comparable to the suggestive comment in McClain ("kill all rats"). 2019 WL 8955241, at *3. Although Zhang's statements were not as overt, "an absence of explicitly threatening language does not preclude the finding of a threat." Turner, 720 F.3d at 424 (alteration and citation omitted) (discussing a related offense of mailing threatening communications under 18 U.S.C. § 876). Fourth, some seven months passed between Zhang's first and last statements, suggesting that this issue had been brewing in his mind for some time and that his antipathy for Abreu's co-defendant was not fleeting. Finally, the warrant affidavit details Zhang's extensive history of criminal activities, including narcotics distribution and possible involvement in a murder-for-hire conspiracy, all of which adds to the likelihood that a person viewing his statements objectively may interpret those words as threatening. Zhang argues that his statements are mere "hyperbolic speech" and points to the absence of any evidence of "criminal intent." (Zhang Mem. 11.) I need not decide whether the information in the warrant affidavit sufficiently articulated mens rea; even if not, the government is not required to show "every element of a crime" to support a finding of probable cause. Ganek, 874 F.3d at 86.

Moreover, the warrant affidavit sufficiently shows that evidence of the crime would likely be found at the premises searched. Zhang posted his statements on a social media platform on his electronic devices. Other relevant evidence would include similar messages sent on electronic platforms, such as through Instagram or text messages. The type of evidence sought here (i.e., digital communications on electronic devices) are also likely to be maintained "months . . . after [the crime] occurred." Ray, 541 F. Supp. 3d at 375. Plus, the information supporting probable cause—with the last message dated a month before the execution of the search—is close in time to when the warrant was executed. And, similar to the analysis with respect to the murder-for-hire crime,[27] I conclude that the issuing magistrate had a substantial basis for finding probable cause under the totality of the circumstances that evidence of the witness-retaliation offense would likely be found at the premises searched.

Furthermore, even if the probable cause showing is somehow infirm, the good-faith exception applies. In contrast to the narcotics offense, case law on witness retaliation and the true-threat doctrine is a developing area of the law.[28] Accordingly, officers can more reasonably rely on the issuing magistrate's finding of probable cause here, and any actual suppression of evidence would be unlikely to yield any meaningful deterrence. Rosa, 626 F.3d at 64.

## II.    The Instagram Warrant

Zhang argues that the Instagram Warrant is overbroad for having no temporal limitations and for permitting the "[w]holesale [s]eizure" of Zhang's Instagram account. (Zhang Mem. 25-35.) This argument is unpersuasive.

---

[27] See supra Section I(A)(ii).

[28] See supra note 26 discussing the Supreme Court's recent decision in Counterman, 143 S. Ct. 2106.

38

As summarized previously, the Instagram Warrant has (i) a Disclosure Clause requiring Instagram to provide broad categories of information from August 1, 2018 to the date of the warrant, and (b) a Seizure Clause permitting the government to seize a narrower set of information tailored to the crimes specified.[29] (Instagram Warrant §§ I-II.) Pursuant to the Instagram Warrant, the government received from Instagram 3,973 pages of PDF data and seized 46 pages. (Zhang Mem. 30.)

In this case, I do not find the Instagram Warrant to be overbroad. First, the structure of the Instagram Warrant resembles that of other social media warrants that courts in this Circuit have upheld. See, e.g., United States v. Pugh, No. 15-cr-116 (NGG), 2015 WL 9450598, at *4-5, 27 (E.D.N.Y. Dec. 21, 2015) (upholding a search warrant that required Facebook to "disclose . . . a substantial amount of information" but permitting seizure of only "information relating to [the charged offense]"); United States v. Westley, No. 17-cr-171 (MPS), 2018 WL 3448161, at *10-17 (D. Conn. July 17, 2018) (same); United States v. Liburd, No. 17-cr-296 (PKC), 2018 WL 2709199, at *3 (E.D.N.Y. June 5, 2018) (same). These cases typically recognize the inherent difficulty with "digital media searches," Liburd, 2018 WL 2709199, at *3, and that "avoiding the intrusiveness of a [digital evidence] search while maintaining its efficacy is largely infeasible," Pugh, 2015 WL 9450598, at *27. See also Liburd, 2018 WL 2709199, at *3 ("It is 'well-established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government.'" (citation omitted)).

---

[29] For example, the Disclosure Clause requires Instagram to disclose "[a]ll business records and subscriber information," including "[i]dentity and contact information," "[a]ll Instagram usernames (past and current) and the date and time each username was active," "[l]ength of service," and "[c]ommunications between Instagram and any person regarding the account," among others; the Seizure Clause, in turn, permits the seizure of "[a]ll records and information . . . related to with [sic] a conspiracy to murder Xin Gu," "preparatory steps taken in furtherance of the scheme," "the murder of Gu," and "payment for the murder of Gu," among others. (Instagram Warrant §§ I-II.)

Further, the scope of the Instagram Warrant is also narrower than the other social media warrants that have been upheld, notably in its inclusion of a temporal limitation.  (Instagram Warrant § 1); cf. Westley, 2018 WL 3448161, at *15-16 (noting that it may be "difficult to craft date restrictions for certain [social media] content for which the affidavits plainly establish probable cause").

In opposition, Zhang cites Shipp, 392 F. Supp. 3d 300.  There, reviewing a similarly structured Facebook warrant, the district court noted "serious concerns regarding the breadth of Facebook warrants like the one at issue." Id. at 307.  The Shipp court observed that, unlike a hard drive or email account, Facebook does not permit a user to store information wherever they want— e.g., a suspect cannot "file[] an incriminating photo as a 'poke'"—and therefore, the usual concerns that "necessitate broad digital search protocols do not . . . exist in the Facebook context." Id. at 309.  Shipp relies extensively on an Eleventh Circuit opinion, United States v. Blake, which likewise concluded that "[t]he means of hiding evidence on a hard drive—obscure folders, misnamed files, encrypted data—are not currently possible in the context of a Facebook account." 868 F.3d 960, 974 (11th Cir. 2017).  Although Shipp and Blake raise important privacy questions with respect to social media platforms, these cases do not support Zhang's position.  Critically, both cases ultimately avoided deciding whether the breadth of the social media warrants violated the Fourth Amendment, and both upheld the warrants on the good-faith exception.  Shipp, 392 F. Supp. 3d at 311 ("[T]he court need not decide whether the Facebook Warrant violated the Fourth Amendment because, even if it did, [it] falls into the 'good faith exception' . . . ."); Blake, 868 F.3d at 974 ("[W]e need not decide whether the Facebook warrants violated the Fourth Amendment because, even if they did, the district court did not err in [applying] . . . the 'good faith exception' . . . .").  Zhang also cites several out-of-circuit opinions that found the underlying social

40

media warrants overbroad. (Zhang Mem. 34-35.) However, like <u>Shipp</u> and <u>Blake</u>, most of those cases ultimately upheld the warrants on the good-faith exception.[30]

For the same reason, I conclude that the good-faith exception applies even if the Instagram Warrant was somehow infirm. There is no allegation here that the issuing magistrate has been misled. Moreover, as multiple cases have acknowledged, the constitutionality of a broad social media search warrant remains a developing area of the law, and the Second Circuit has not yet decided this issue. <u>See</u> <u>Westley</u>, 2018 WL 3448161, at *17 ("[T]he application of search warrants to Facebook accounts is a relatively new area of the law."). Therefore, it is not unreasonable at this juncture for officers to rely on a social media warrant that was issued by a neutral magistrate and that is otherwise supported by probable cause and not facially deficient. <u>See</u> <u>Blake</u>, 868 F.3d at 975 (describing the issue as "not an open and shut matter" and "a close enough question" such that the officers could reasonably rely on the warrants); <u>Shipp</u>, 392 F. Supp. 3d at 312 ("The [warrant affidavit] articulated probable cause to search at least certain categories of information or services associated with the Facebook account, and as the Government notes, other district courts have declined to suppress evidence obtained pursuant to facially similar warrants.").

However, my holding here adopts my conclusion with respect to Zhang's other crimes of narcotics offense and witness intimidation.[31] For the same reason as articulated above, I find that (i) the Instagram Warrant insufficiently states probable cause for the narcotics offense and that the government has not met its burden to apply the good-faith exception, but (ii) the Instagram Warrant

---

[30] <u>See</u> <u>United States v. Mize</u>, No. 18-cr-74, 2020 WL 5505793, at *5 (S.D. Ohio Sept. 11, 2020) ("[E]ven if the Facebook Warrant was overly broad, the good-faith exception to the exclusionary rule applies."); <u>United States v. Hamilton</u>, No. 18-cr-57, 2019 WL 4455997, at *4-7 (E.D. Ky. Aug. 30, 2019) (finding the Facebook warrant overbroad but declining to suppress the evidence on the basis of the good-faith exception); <u>United States v. Chavez</u>, 423 F. Supp. 3d 194, 208 (W.D.N.C. 2019) (same). <u>But see</u> <u>United States v. Irving</u>, 347 F. Supp 3d 615, 625 (D. Kan. 2018) (invalidating the Facebook warrant and declining to apply good faith).

[31] <u>See</u> <u>supra</u> Section I(E).

41

sufficiently states probable cause for the witness intimidation offense. Accordingly, I exclude any evidence seized pursuant to the narcotics offense but will otherwise uphold the Instagram Warrant as valid.

### III. Zhang's Motion for a Bill of Particulars

Finally, Zhang seeks an order for the government to file a bill of particulars identifying any unindicted coconspirators. (Zhang Mem. 38-40.) Pursuant to Federal Rule of Criminal Procedure 7(f), a defendant may seek a bill of particulars to (i) "identify with sufficient particularity the nature of the charge pending against him, thereby enabling [him] to prepare for trial"; (ii) "prevent surprise"; and (iii) "interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). A district court has discretion to grant a bill of particulars by assessing six-factors:

> (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation.

United States v. Nachamie, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000).

Here, five of the six factors weigh against Zhang. With respect to Factors One and Two, (i) the conspiracy was small and involved only four defendants and perhaps a few additional undisclosed, unindicted coconspirators; (ii) the conspiracy was relatively short, with the bulk of the planning and execution of the crime occurring over the span of a few months from August 2018 to February 2019; and (iii) Zhang was allegedly at the scene of the crime and therefore likely knows the identity and the number of his coconspirators. (See Gov't Opp'n 56); cf. Nachamie, 91 F. Supp. 2d at 572 ("If there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met."). With respect to Factors Three and Four, although the government appears to

have produced a decent volume of materials, the vast bulk of discovery was produced ten months before trial, giving Zhang sufficient notice of his alleged role in the conspiracy and the charges. (See Gov't Opp'n 56.)  More importantly, with respect to Factors Five and Six, "the fact that defendant is charged with crimes of violence, including murder . . . , weighs heavily against disclosure of the names of defendant's unindicted co-conspirators."  United States v. Messina, No. 11-cr-31 (KAM), 2012 WL 463973, at *12 (E.D.N.Y. Feb. 13, 2012).  Because "requests for bills of particulars have rarely been granted in cases involving defendants charged with violent offenses," United States v. Columbo, No. 04-cr-273 (NRB), 2006 WL 2012511, at *6 n.18 (S.D.N.Y. July 18, 2006), I likewise decline to do so in this case.

## CONCLUSION

For the foregoing reasons, Yu's motion to suppress is DENIED in its entirety, as is his motion for a Franks hearing.  Zhang's motion to suppress is GRANTED IN PART and DENIED IN PART.  Specifically, his motion to suppress the Zhang Premises Warrant and the Instagram Warrant is DENIED with respect to the murder-for-hire crime and witness retaliation, but GRANTED with respect to the narcotics offense.  Moreover, Zhang's motion for a bill of particulars is DENIED.

SO ORDERED.

Dated: July 20, 2023
       Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

43