1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                    22-CR-208(CBA)
3   UNITED STATES OF AMERICA
                                    United States Courthouse
4           -against-              Brooklyn, New York

5                                   March 7, 2023
                                    2:00 p.m.
6   QING YU and ZHE ZHANG,

7           Defendants.
    ------------------------------x
8
        TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
9           BEFORE THE HONORABLE CAROL B. AMON
            UNITED STATES SENIOR DISTRICT JUDGE
10

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  GABRIEL PARK, ESQ.
                                    JAMES McDONALD, ESQ.
15                             Assistant United States Attorneys

16  For the Defendant:         LAW OFFICES OF JAMES KOUSOUROS
    Qing Yu                    260 Madison Avenue - 22nd Floor
17                             New York, New York 10016
                               BY:  JAMES KOUSOUROS, ESQ.
18
    For the Defendant:         JOEL S. COHEN, P.C.
19  Zhe Zhang                  75 Maiden Lane- Suite 607
                               New York, New York 10013
20                             BY:  JOEL S. COHEN, ESQ.
                                    - and -
21                             MEISTER SEELIG & FEIN LLP
                               125 Park Avenue - 8th Floor
22                             New York, New York 10017
                               BY: HENRY E. MAZUREK, ESQ.
23                                  JASON SER, ESQ.

24  Also Present:              TUO HUANG, INTERPRETER
                               STEPHANIE LIU, INTERPRETER
25

*LINDA D. DANELCZYK, RPR, CSR, CCR - Official Court Reporter*
*718-613-2330 - LindaDan226@gmail.com*
*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

                          PROCEEDINGS                    2

 1              (In open court.)

 2              (Defendants enter the courtroom.)

 3              THE COURTROOM DEPUTY:  All rise.

 4              Good afternoon.  This is criminal cause for as

 5    supression hearing, 22-CR-208, USA versus Yu, et al.

 6              May the parties please state your name for the

 7    record, starting with the government.

 8              MR. PARK:  Good afternoon, Your Honor.  Gabriel Park

 9    for the government.  And I'm also joined by AUSA James

10    McDonald.

11              THE COURT:  Good afternoon.

12              MR. KOUSOUROS:  Good afternoon, Your Honor.  James

13    Kousouros.  I represent Allen Yu, who is standing to my left.

14              THE COURT:  Good afternoon.

15              MR. MAZUREK:  And good afternoon, Your Honor.  Henry

16    Mazurek.  I'm joined by Jason Ser and Joel Cohen on behalf of

17    Mr. Zhang, who is present with us in court.

18              THE COURT: All right.  Good afternoon.

19              MR. MAZUREK:  Judge, before we begin, if I might, I

20    want to say a Mandarin interpreter is in the courtroom who is

21    interpreting for Mr. Allen Yu.

22              And I do request, Mr. Zhang's mother is only a

23    Mandarin speaker, if there are an extra head sets for the

24    mother.

25              THE COURT:  I don't know if there are.

PROCEEDINGS                              3

1          (Discussion was had off the record.)

2          THE COURT:  That's fine.  If you have enough, if you

3    want to give one to his mother.

4          MR. MAZUREK:  Thank you, Judge.

5          THE COURT:  You all can be seated.  Thank you.

6          So this matter was on -- is on this afternoon based

7    on the supression motions made by Defendant Yu and

8    Defendant Zhang.  That's why just these two defendants are

9    present in court.

10          I've read the papers.  Mr. Kousouros, you want to

11    say anything in addition on behalf of your client?

12          MR. KOUSOUROS:  Your Honor, I've reviewed our

13    submissions, and I do think they're comprehensive, and you've

14    read them.  Unless the Court has any questions, I --

15          THE COURT:  Well, you know, the government, you had

16    sought, I believe, a *Frank* hearing, correct?

17          MR. KOUSOUROS:  Yes.

18          THE COURT:  And perhaps you just want to articulate

19    the basis for that.  It's because you think that there are

20    potentially false statements in the affidavit?

21          MR. KOUSOUROS:  Your Honor, what we cited in terms

22    of our *Frank's* motion was, it really -- it's like the

23    confluence of our arguments.

24          The affidavit indicates that there's cooperation --

25          (Court reporter interrupts for clarification.)

PROCEEDINGS                              4

1          MR. KOUSOUROS:  And our argument was in reviewing

2     the affidavit, for example, the financial information that's

3     provided, it is false, and it is claimed to be an affidavit

4     that, for example, the victim in this case had brought in

5     $30 million of worth, and his salary was $135,000 in that one

6     calendar year, and that it was corroborated by financial

7     records.

8          We provided the financial records.  The financial

9     records show gross income of $13 million for that year, and a

10    substantially lower salary.

11         And the way the affidavit is, where we're pretty

12    much divided, is you have Witness 1 and Witness 2 that really

13    don't provide any specific evidence relating to the murder for

14    hire or the actual commission of the crime, but they provide

15    all of the background here and none of it is, in our view,

16    corroborated or sufficient.

17         And in terms of corroboration, we don't know, we

18    can't fathom how an agent can say that this information, which

19    presumably is in there to establish some form of a motive,

20    could have been corroborated when the easily obtainable

21    financial records clearly indicate otherwise.

22         But really the gravamen of our motion, Judge, I

23    don't respectfully know that we need to get there, because I

24    don't see how this warrant survives a staleness inquiry, or

25    even a nexus inquiry, or even if it were -- if they had

PROCEEDINGS                    5

1    searched my client's office --

2            THE COURT:  But did your client -- I know that

3    perhaps the government doesn't rely on this, but it is a

4    statement in the affidavit, hadn't this business closed?

5            MR. KOUSOUROS:  No, his business never closed.  His

6    business was running, kept running and continued making money.

7            He -- I think he closed the one corporation, but

8    continued in his construction business to the day that he was

9    arrested.

10           So it's not as though he moved everything to his

11   house, or if there's anything in the affidavit that he closed

12   his business and so any evidence that would have been obtained

13   from his office would have been at his house.

14           There's no nexus.  Even if you believe, and I don't

15   think there's any support for you to believe that he was

16   making a few phone calls from his house.

17           None of the codefendants worked at the time.  So if

18   he's calling, for example, or emailing his workers on site to

19   make sure that the studs were in properly or something like

20   that, it has nothing to do with this crime.

21           So that's why I was saying that, I think it would be

22   stale anyway, but this is a business dispute.  If they had

23   searched his office, if they thought or they had probable

24   cause that it wasn't stale, that his computers at his office

25   or there would be records in his office that were evidence of

PROCEEDINGS                                6

1    criminality, I'd be left with a staleness argument, and I

2    still think it would be compelling.

3            But in this case, you've got two witnesses who have

4    demonstrated no personal knowledge of what they speak of

5    saying that he would make phones calls from his house.  I

6    don't know how they know that.  That he stored cash in the

7    office.  I think it's paragraph 57 of the affidavit.  That he

8    stored these wild amounts of cash at his office, and then an

9    errant remark that he would also bring some cash from his

10   house.

11           There's no basis of knowledge for that with the

12   notion that you needed to search his house 39 months later to

13   see if he could make good on a promise to pay for a murder for

14   hire 39 months before, where the government's own evidence is

15   that he already paid for it by way of a check, it just doesn't

16   make any sense.

17           And I don't say this often, but I don't know,

18   because it's not often I can say it, I don't know how this

19   warrant survives a staleness inquiry, and I don't know how the

20   warrant survives the lack of any plausible nexus between this

21   crime in 2019, and I did put in my papers, most generously to

22   the government, if you even take into consideration that they

23   allege a payment was made to a codefendant in December of

24   2019, then it's 29 months old, but even that, the basis to

25   search his house, in terms of the nexus is nonexistent.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                    7

1           And then the warrant basically permitted them to

2    clean the house out of any and all electronic devices.  And

3    permitting them to go and search and seize evidence of, you

4    know, other companies with which he was affiliated that have

5    absolutely nothing to do with the allegations made here.

6           So it just seems to be deficient, in my humble

7    opinion, not only with respect to the staleness, not only from

8    a perspective that there be no nexus to his house, but also

9    from the perspective of being overbroad.  And then when you

10   get finally to *Frank's*, you know, you have these assertions

11   that are made, that are easily debunked or corroborated with

12   financial records which are public and we provided them, and

13   they're false, so.

14           THE COURT:  Well, what statements -- admittedly the

15   financial information was wrong.  The government said that

16   they attribute the 30 million to one year when it was over a

17   series of years and the salary was not accurate.

18           How is that a material part of the warrant, even if

19   it was wrong?

20           MR. KOUSOUROS:  Well, the standing alone, I

21   certainly take your point.

22           We do also cite what we believe to be

23   inconsistencies between the 2021 affidavit, which is

24   predicated, we think, on the same complainant.  And I also

25   think that not disclosing to the magistrate that not only was

PROCEEDINGS                    8

1    all the information from the Witnesses 1 and 2 not

2    corroborated, but that they were disgruntled employees who

3    then went with the victim and then were receiving all of their

4    information from the victim.  I think that those were

5    omissions that should have been put in.

6            But I fully acknowledge and I am asserting to you

7    that our strongest argument here is the staleness and the lack

8    of any nexus, irrespective of whether or not the either

9    misstatements or lack of statements, the omissions, rise to

10   the level of an appropriate *Frank's* here.  I submit to you,

11   respectfully, we don't need to get there.

12           THE COURT:  Let me just address one other item.

13           There were six specific items that you disputed that

14   were seized that you asked to have returned to you.

15           MR. KOUSOUROS:  I think there were six, yes, Your

16   Honor.

17           THE COURT:  Were they returned?

18           MR. KOUSOUROS:  We received --

19           THE COURT:  I think one was the daughter's bank card

20   and the wife's calendar.

21           MR. KOUSOUROS:  The last time I was here, Judge, the

22   only thing that I believe I received was a big desktop and

23   a -- two cellular phones.

24           THE COURT:  All right.

25           MR. KOUSOUROS:  I'm sorry, I don't --

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                   9

1              THE COURT:  Let me just ask the government before I

2    have them address your staleness argument.

3              Who is speaking for the government, Mr. Park?

4              MR. PARK:  Just me, Your Honor.

5              THE COURT:  The six items that were -- that Mr. Yu

6    asked to have returned, including the bank card and the

7    calendar, have those items been returned?  What is your

8    position with respect to those items?

9              MR. PARK:  They are -- they can be en route to be

10   returned, Your Honor, we just haven't coordinated with defense

11   counsel.

12             THE COURT:  All right, so the six items that he

13   mentioned specifically in his papers as having no evidentiary

14   value, you will, in fact, return those?

15             MR. PARK:  Yes, Your Honor.

16             MR. KOUSOUROS:  And I do acknowledge receipt of that

17   one computer that I think we took last month.

18             THE COURT:  Okay.

19             All right, let me ask the government a practical

20   question.

21             I take it it's your position that items seized from

22   Mr. Yu's house you intend to offer into evidence?

23             MR. PARK:  Yes, Your Honor.

24             THE COURT:  Just tell me what kind of evidence that

25   is.

PROCEEDINGS                                    10

1          MR. PARK:  It will be mostly the records pertaining

2    to his Amaco business.  Financial documents, tax return

3    documents relating to the Amaco business.

4          Really, it goes to show the financial status at the

5    company leading up to the murder, which it goes to motive as

6    well.

7          THE COURT:  You took a number of devices, correct?

8          MR. PARK:  That's correct, Your Honor.

9          THE COURT:  Cellphones, computers, all of that.

10         Any of the information that you gleaned from those

11   devices are you seeking to offer?

12         MR. PARK:  Yes, Your Honor.  We seized a total of

13   eight devices from Mr. Yu's residence.  And then we -- at this

14   point we have identified four devices that we have identified

15   some responsive records pursuant to the warrant.  And there's

16   one that is still waiting to be accessed.

17         THE COURT:  There's one taken from Mr. Yu's home

18   that's waiting to be accessed?

19         MR. PARK:  Yes, Your Honor.

20         THE COURT:  I thought that was Mr. Zhang.

21         MR. PARK:  There are some with Mr. Zhang's as well,

22   but there's one device still remaining that we have not

23   accessed that was seized from Mr. Yu's residence?

24         And --

25         THE COURT:  What's the status of that when you say

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

PROCEEDINGS                                    11

1    "not accessed"?

2              MR. PARK:  Due to encryption, we weren't able to --

3    they're still plugged in and the forensic analysts are trying

4    to get access to them, but they have not been able to do so.

5              But the remaining three phones have been returned

6    because we did not find any responsive data on those.

7              THE COURT:  Oh, so wait a minute.  I'm sorry.

8              How many -- how many phones did you -- you took

9    three phones, or four phones; is that right?

10             MR. PARK:  In terms of phone, Your Honor, we seized

11   three phones.

12             THE COURT:  Okay, three phones, and the three phones

13   have been returned?

14             MR. PARK:  Two of them have been returned, one has

15   been -- we have retained that because we found some responsive

16   records in that phone.

17             THE COURT:  Okay, so what was the -- all right, I'm

18   sorry, just so I understand this.

19             So you seized three phones, two have been returned,

20   one has what the government thinks has evidence on it,

21   correct?

22             MR. PARK:  That's correct, Your Honor.

23             THE COURT:  All right.  Now what are the other

24   devices that were taken?  That's phones.

25             MR. PARK:  Yes, Your Honor.

PROCEEDINGS                                    12

1              There are three computer.

2              THE COURT:  Okay.  And?

3              MR. PARK:  There's one external hard drive, and

4    there's one iPad.

5              THE COURT:  Now what is the status of those?

6              MR. PARK:  So the iPad is the one that has not

7    been accessed, Your Honor.

8              THE COURT:  Okay.  What about the hard drive?

9              MR. PARK:  The hard drive and two of the computers

10   the government believes that we have identified evidence in

11   those devices.  So they're currently in law enforcement

12   custody.

13             THE COURT:  So the hard drive and one computer or

14   two computers?

15             MR. PARK:  Two computers, Your Honor.

16             THE COURT:  Two.

17             Okay, so what about the third computer?

18             MR. PARK:  That has been -- that has been returned.

19             THE COURT:  Okay.  And the iPad you have not been

20   able to access.

21             MR. PARK:  That's correct, Your Honor.

22             THE COURT:  And the hard drive, I'm sorry, what did

23   you tell me about the hard drive?

24             MR. PARK:  The hard drive the government has

25   identified evidence in that device, so we have kept custody of

PROCEEDINGS                                    13

1    that device.

2              THE COURT:  Okay.

3              Why don't you, if you will, address counsel's

4    staleness argument.

5              MR. PARK:  Yes, Your Honor.

6              The government respectfully submits that the

7    evidence that we have seized from Mr. Yu's residence is not

8    stale because his activity was --

9              THE COURT:  Well, it's whether the warrant was

10   stale --

11             MR. PARK:  Right.

12             THE COURT:  -- whether the information in the

13   warrant was stale, not the evidence.

14             MR. PARK:  This was not an isolated incident.  The

15   conspiracy, the government submits that could have begun as

16   early as August of 2018 when Mr. Gu, the victim, left the

17   company and the defendants and the codefendants began, you

18   know, planning out the murder, recruiting, you know,

19   participants of the murder.  And obviously that immersed in --

20   actually resulted in the murder, and then there were

21   subsequent communication and conspiracies that continued until

22   payments, additional payments that were made months, if not

23   years, afterward.

24             Understand the government has put forth and also

25   mentioned the affidavit about the payment that Mr. Yu's

PROCEEDINGS                                      14

1    company made to Mr. Zhang's company in December 2019.  And

2    there's also payments discussed in form of a luxury watch

3    between Mr. Zhang and Mr. Abreu in September 2021, since the

4    government's position that the conspiracy for the murder

5    scheme that involves the payment for a murder was something of

6    a continuing nature.

7            Specifically with Mr. Yu, the government submits

8    that his activity at his residence, when it comes to evidence

9    of the motive and evidence of the payment, was something that

10   was also continuing and was not an isolated nature.

11           As the government has submitted, also as we noted in

12   the affidavit, the affidavit contains information about how

13   Mr. Yu used the home to conduct Amaco business and communicate

14   with Amaco employees from his residence.

15           And as the defense counsel alluded to, there was

16   also an affidavit containing information about Mr. Yu's use of

17   his house to store all cash, which sometimes he used that cash

18   to pay the employees of Amaco.

19           So that cash is also tied to how he ran the business

20   from outside of his home as well.

21           THE COURT:  Were you also looking for documents that

22   would have pertained to the conspiracy itself from the 18th

23   through even the date of the murder?  Were you hoping to find

24   documents there that shed light on that as opposed to some

25   continuing crime?

PROCEEDINGS                                    15

1          MR. PARK:  Yes, Your Honor.

2          THE COURT:  What kind of things would you --

3          MR. PARK:  We were strictly looking for Amaco

4   records, the company Amaco records at his home, that would

5   give evidence as to the finances, financial nature or change

6   in financial nature, especially timeline compared to when

7   Mr. Gu joined the company, began working for Mr. Yu at Amaco

8   and when he left the company, and the subsequent closure of

9   the company in late 2018.

10          I understand that, and as the affidavit mentioned,

11  Mr. Yu had several, a number of other businesses opened in his

12  name.  The government submits that those are also relevant

13  because there was certainly records of payment that Mr. Yu

14  made to Mr. Zhang through company accounts, not personal

15  accounts, through company accounts, and it was reasonable for

16  the law enforcement to obtain evidence of not only the status

17  of the company that would show the motive, but also as to any

18  of the payments that have been made using Mr. Yu's Amaco

19  account or other business accounts.

20          THE COURT:  You were looking for phones.

21          MR. PARK:  Yes, Your Honor.

22          THE COURT:  Did you have a basis to believe that the

23  phones, still on those phones would be communications as far

24  back as the time of the murder that would substantiate his

25  correspondence with co-conspirators?

PROCEEDINGS                                    16

1          MR. PARK:  Yes, Your Honor.

2          As the law enforcement put forth in the affidavit,

3    we certainly put information of how Mr. Yu was using the

4    electronic devices.

5          (Interruption.)

6          MR. PARK:  I apologize, Your Honor.

7          The evidence has mentioned specific incidents of

8    communications that Mr. Yu made with codefendants,

9    specifically with Mr. You You.  Also, Your Honor, the

10   affidavit puts forward quite a bit of information, technical

11   information as well as the information put forth by the

12   affiant, that just the nature of the phone and how it stores

13   data for it for a number of years at a time.

14         And the affidavit also specifically mentions, I

15   believe in paragraph 52, how -- the nature of these

16   smartphones and devices, individuals tend to keep those

17   devices for extended period of time due to not only the cost

18   of replacing these devices, but also the nature of like how

19   these devices store information for long period of time.

20         And even if they switch devices, it is presumed to

21   believe that any of the information, data, contacts, text

22   messages or media files, can be transferred over to a new

23   device, either automatically or by manually.

24         So the affidavit put forth information about

25   Mr. Yu's specific contacts with codefendants during or near

PROCEEDINGS                                    17

1   the time of the murder.  Also that it is reasonable to believe

2   that Mr. Yu would have kept those devices, his personal

3   devices, at home in his residence, and those devices would

4   have contained information even dating back several years

5   because of the nature of how this type of data is stored in

6   these devices.

7              THE COURT:  Obviously, your finding something after

8   the fact is not relevant, it's what you knew at the time.  But

9   did you find evidence of communications on his phone between

10  the defendant and co-conspirators?

11             MR. PARK:  Yes, Your Honor, we found evidence of

12  communications -- additional communications on these devices.

13             And on that point, Your Honor, just -- it's not

14  directly related to the question you just asked, but -- and

15  obviously this was concerning the Defendant You You, not

16  Mr. Yu, but You You's burner phone which is referenced in the

17  affidavit multiple times, even though he used that as a burner

18  phone back in 2018, that particular phone was found and seized

19  at his residence three years later, four years later.

20             THE COURT:  At You You's residence.

21             MR. PARK:  At You You's.

22             But I only mention that, Your Honor, understanding

23  the information after the fact is not considered for the

24  affidavit that's mentioned.

25             THE COURT:  Right, right.

PROCEEDINGS                                    18

1         MR. PARK:  But it just shows the nature of how

2    individuals retain phones and devices for a number of years.

3         THE COURT:  Okay, let me see if I have any further

4    questions.

5         Why don't we turn --

6         Mr. Mazurek, are you going to argue?

7         MR. MAZUREK:  Yes, Your Honor.  Actually we've

8    bifurcated the argument, I'm arguing on the California warrant

9    and Mr. Ser is going to argue with respect to if you have any

10   questions regarding the Instagram.

11        THE COURT:  Oh, okay.

12        Let me just get some preliminary matters out of the

13   way.

14        With regard to the series of devices, the cell phone

15   extraction report, the government has said that in connection

16   with your argument it was, you know, past 120 days, but if you

17   look at the reports, it actually shows you that it was within

18   the 120 days, it was just the report itself that is dated

19   afterwards.

20        Do you concede that?  Are you still challenging

21   that?

22        MR. MAZUREK:  I still challenge that, Your Honor.  I

23   don't think there's enough evidence on this record to

24   indicate, one way or the other, what searches were done,

25   because the searches that were conducted, were conducted by

PROCEEDINGS                                    19

1   law enforcement agents, and they have also been conducted by

2   prosecutors.  We have no supporting affidavit that suggests

3   how the searches were conducted.

4          The documents themselves, the Cellebrite reports in

5   our Exhibit C have a creation date of when the Cellebrite

6   report was created, which is beyond the 120 day.

7          THE COURT:  Right.

8          MR. MAZUREK:  The only other information is when the

9   extractions were conducted.  The extractions, as I understand,

10  the Cellebrite reports would indicate when the contents of the

11  phone were extracted into the Cellebrite software for purposes

12  so they would be downloaded into the Cellebrite's software to

13  allow for searches to be conducted by those who have access to

14  the Cellebrite data.

15         In other words, it was within -- after the

16  extraction from the original phone in to the Cellebrite

17  program, then law enforcement would have the ability to

18  conduct searches, key word searches, filtering searches, look

19  through all the photographs, however they did conduct that

20  search, but we have absolutely no information on this record

21  as to how those searches were actually conducted.

22         And as I indicated in my papers, Your Honor, what at

23  least has to happen -- there used to be a local rule in this

24  district and the Southern District which says very

25  specifically that the courts, for purposes of motion hearings

PROCEEDINGS                                        20

1   in criminal cases can't just accept the word of lawyers in

2   briefs because that's not evidence.  It always requires sworn

3   affidavits to accompany the fact portion of the presentation

4   in the briefs.

5         Here we have simply none of that.  And there is case

6   law we cite, *United States versus Pinto-Thomaz,* P-I-N-T-O,

7   hyphen, T-H-O-M-A-Z, which is a Southern District case where

8   Judge Rakoff found that unsworn statements that are made in

9   legal briefs are just not sufficient for purposes of making

10  factual determinations in Rule 12 motion, supression motions.

11        So I do think that we are in the position where we

12  just don't have that information, and that, in combination

13  with Your Honor, the facts that the government in this case

14  concededly and repeatedly violated the express provisions of

15  the California warrant by, one, completely ignoring the

16  120-day limit rule that is expressly in the warrant, and

17  secondly, by continuing to have devices plugged in to which,

18  under case law that we put in our briefs, represent continuing

19  searches of these devices without getting another warrant.

20  Again, an express violation of the California warrant in

21  Attachment B.

22        So the government has in this case ignored the terms

23  of the warrant on numerous occasions, and we're asking the

24  Court now to rely simply on an unsworn statement that there

25  were no searches conducted on the five devices that they have

PROCEEDINGS                                          21

1    found of what's so-called responsive material beyond the 120

2    days.

3              And I think that is absolutely inadequate as an

4    evidentiary matter and requires, at the very least, sworn

5    statement as to how and who conducted these searches and when,

6    and more preferably a more searching evidentiary hearing so

7    that we can get to the bottom as to how those searches were

8    actually conducted.

9              THE COURT:  All right, on that issue, Mr. Park, can

10   you provide something other than your statement in a brief as

11   to when they were done?

12             MR. PARK:  Yes, Your Honor.  I could -- one, I can

13   make clear on the brief, especially noted that the creation

14   that the defense counsel is talking about is I believe when

15   the defense has opened it, because that data is the dated

16   after we already provided the report to them.  So it doesn't

17   even make sense that how we would have been able to rewrite

18   that or search that, that file that we already provided to the

19   defense if it's in the defense possession.

20             THE COURT:  I'm not sure I understand what you're

21   saying.

22             MR. PARK:  So obviously we noted in our response the

23   date that they're talking about instead it shows that the

24   creation date of these files.  That was after we had already

25   provided that -- those files to the defense counsel.

PROCEEDINGS                                22

1          So we clearly couldn't have searched that file after

2     we provided it to the defense.  If that makes sense.

3          MR. MAZUREK:  Judge, can I make two points on that,

4     which may help explain what's going on here.

5          So the Cellebrite extraction reports and our

6     Exhibit C to the filed motion --

7          THE COURT:  Right.

8          MR. MAZUREK:  -- the creation date of that report,

9     of all these reports are September 29th of 2022, all between

10    the hours, it looks like -- well, there's one from 10 a.m. and

11    the others were all at 5 -- around between 5 and 6 p.m. on

12    September 29th of 2022, okay.

13         I think what Mr. Park is suggesting is that there

14    was a discovery letter, which was put on ECF on September 28th

15    of 2022, which is the day before the dated -- the creation

16    date of these extraction reports.

17         What I can tell you, Your Honor --

18         THE COURT:  Is that within the 120 days?

19         MR. MAZUREK:  No, September 7th was the cutoff of

20    the 120.

21         THE COURT:  Yes, okay, so.

22         MR. MAZUREK:  This is beyond the 120 days.

23         Now, why I think Mr. Park might be saying that we

24    created these extraction reports, which we don't have the

25    ability to do because I don't have Cellebrite, we have readers

PROCEEDINGS                                23

1    that can read the data that is taken off the Cellebrite, but

2    we don't have the ability to create Cellebrite extraction

3    reports.  I don't have that program.  Never have.  And we

4    didn't create these, this was created by law enforcement.

5         What likely happened here is that the government

6    filed its cover letter on September 28th by ECF, but still

7    hadn't completed the production of the actual information that

8    they're saying they were producing on September 28, 2022 until

9    some days later.  And that is often the case that we get the

10   information, you know, from the vendor sometime after the

11   cover letter has been filed.

12        So what I suspect happened, and again we don't know

13   because there's no affidavit on the record, that law

14   enforcement continued to create the PDF files the day after

15   the cover letter was filed by ECF.

16        THE COURT:  I think -- I hate to say this, but I

17   think both of you have lost me.

18        I understood that the issue was much simpler than

19   that, which is --

20        MR. PARK:  Your Honor, I think I can really --

21        THE COURT:  Okay, but let me just state my

22   understanding and then you correct me if I'm wrong, okay.

23        But I understood the government's position to be

24   that the date that the report was created, I'm just looking at

25   one first, 9/29, was when the report was created, obviously,

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

PROCEEDINGS                                                    24

1  but the date that you looked at is the extraction date, which

2  was 6/30, for instance, on the first one.

3         Is that what your point was?

4         MR. PARK:  Your Honor, my point was that once you

5  open these extracted reports, it's going to overwrite the

6  data, overwrite that date.  So it doesn't necessarily say --

7         THE COURT:  So every time you open it, it puts a new

8  date on it?

9         MR. PARK:  Yes, Your Honor.

10        THE COURT:  But is that the report creation date or

11 is that the extraction date?

12        MR. PARK:  The report creation date, Your Honor, for

13 all the extractions in this case occurred within the month of

14 August 2022, which is before --

15        THE COURT:  You know, why don't you do this.  Why

16 don't you put in an affidavit from an agent or whoever it is

17 who created this that explains all of this, because I don't

18 understand it.

19        MR. PARK:  Yes, Your Honor.

20        THE COURT:  Okay?  I think that will just end this

21 issue.

22        Let me just address one other issue is the six

23 devices, one recently decrypted, and I guess five that haven't

24 been decrypted at all, right, or never decrypted, that the

25 government said you were getting another search warrant for?

PROCEEDINGS                                      25

1        MR. PARK:  So, Your Honor, so out of the six devices

2   that were initially remain inaccessible --

3        THE COURT:  Right.

4        MR. PARK:  -- one became accessible.  So before

5   searching them, we did obtain an additional search warrant,

6   and upon searching it, we did not find any responsive

7   evidence, so we returned -- or we are ready to return that

8   device, Your Honor.

9        So there are five devices that are -- that remain

10  inaccessible at this point.

11       THE COURT:  When did you get the search warrant?

12       MR. PARK:  For the?

13       THE COURT:  The one that was --

14       MR. PARK:  The one that became accessible, we

15  obtained the search warrant in February of this year, Your

16  Honor.

17       THE COURT:  From whom?

18       MR. PARK:  From Judge Merkl.

19       THE COURT:  But now did that search warrant cover

20  all of the devices or just --

21       MR. PARK:  Just the --

22       THE COURT:  The way you read it, as I read it in

23  your papers, you were going to get a search warrant to cover

24  all of the devices, even the ones you hadn't opened.

25       MR. PARK:  At this time, Your Honor, we've only

PROCEEDINGS                                        26

1   obtained search warrant for just that device that became

2   technically accessible.  We have not obtained search warrant

3   for the five that we have not been able to access.

4                THE COURT:  Well, what is the status of the five

5   that you haven't accessed?

6                MR. PARK:  They still remain encrypted and unable to

7   be -- actually be searched, the content of the phones.

8                THE COURT:  Well, assuming you are in that

9   situation, can you keep those phones forever?  I mean, what

10  are the time limit constraints on something like that, where

11  they are encrypted and you can't decrypt them, do you just get

12  to keep them for eternity?

13               MR. PARK:  I wouldn't say eternity, Your Honor,

14  but --

15               THE COURT:  What's reasonable?

16               MR. PARK:  I mean, the government believes that it

17  is reasonable given, one, that it was initially seized

18  pursuant to a valid search warrant, seized search warrant.

19  Pursuant to that search warrant, the law enforcement has been

20  trying to access those devices, so due to the technical

21  capability, law enforcement just hasn't been able to.

22               THE COURT:  Is there any hope that -- I mean, what

23  do the technical people tell you about it?  Is there any hope

24  that they'll be able to open them?

25               MR. PARK:  They were able to open one of the -- one

PROCEEDINGS                                      27

1    out of the six that became inaccessible.  So I'm not sure

2    exactly the timeline or the technical capabilities of FBI

3    forensics unit at this time, but we're hoping that we will be

4    able to get access to them soon since we were able to open one

5    of them.

6            THE COURT:  What is your position with respect to

7    those, Mr. Mazurek?  Though, it's an interesting question,

8    they're not able to open them up.  So they seized them, I

9    guess they haven't searched them.

10           MR. MAZUREK:  Well, Your Honor, we think that the

11   answer is very clear.  In fact, it's spelled out in the

12   California search warrant pursuant to which they were seized.

13   There is an express provision in Attachment B, Subpart 2,

14   which identifies the topic very clearly as search procedure

15   for digital devices.

16           Then if you go to paragraph 1, little G, which is on

17   Bates number 2531 of the government's discovery production,

18   and our Exhibit A to the motion, it reads the following:

19           The government may also retain a digital device if

20   the government, prior to the end of the search period, which

21   is defined as 120 days, obtains an order from the court

22   authorizing retention of the device, including in

23   circumstances where the government has not been able to fully

24   search a device because the device or files contained therein

25   is, slash, are encrypted.

PROCEEDINGS                                    28

1          So the government in their own -- in the warrant

2     that they sought, and that the judge in California granted in

3     May of 2022, defined the search period as 120 days, and

4     explains that to determine what is reasonable, the court

5     explained what is reasonable to the government to say that if

6     within that 120 days you still are seeking to decrypt the

7     seized device, you have to go back and get another warrant

8     because this warrant terminates.

9          So right now, under where we stand, those five

10    devices are unlawfully seized against my client.  There is no

11    constitutional basis for them to continue to hold it, and they

12    are in violation --

13         THE COURT:  Well, the constitution is different from

14    the 120-day order.  The constitution is a reasonableness

15    standard.  The 120-day order is not necessarily a

16    constitutional requirement.

17         I understand that it was -- that, you know, put in

18    an order from a judge and, obviously, it should be followed.

19    But whether suppression as a Fourth Amendment matter is, I

20    think, a different issue.  Fourth Amendment we're talking

21    about reasonableness.

22         MR. MAZUREK:  Well, Your Honor, I think when there

23    is a warrant that explains, you know, the contours under which

24    the government can seize and search an object when they have a

25    warrant, then the terms of the warrant helps to define

1    reasonableness for Fourth Amendment purposes, otherwise they

2    need to go to an exception of that warrant, which they don't

3    have.

4               So if they're in violation of the express terms of

5    the warrant, I believe that does define reasonableness within

6    the Fourth Amendment context, because that's -- unless they

7    can come up with a constitutionally accepted exception to that

8    warrant requirement, they don't have the ability to continue

9    to seize it.

10              And we are now well beyond that.  I mean, we are --

11   this expired on September 7th, 2022.  They have not sought a

12   warrant since then, so we are already several months past that

13   time, and that we would claim is not reasonable under any

14   interpretation of the Fourth Amendment, and certainly an

15   express violation of the Court's order.

16              THE COURT:  Mr. Park?

17              MR. PARK:  Your Honor --

18              THE COURT:  That was a provision of the warrant, how

19   can you just ignore it?

20              MR. PARK:  The government is not ignoring, per se,

21   Your Honor, the government does understand that the government

22   has to physically search --

23              THE COURT:  No, but that's not what it says, what

24   counsel just read.  I thought that I read your response in the

25   subsequent letters to say that, you know, you were going to go

PROCEEDINGS                                    30

1   back and request a warrant for all of them, for all the

2   devices.

3        MR. PARK:  Your Honor, I apologize, the government

4   did not mean to misstate or misrepresent the letter, but just

5   from a practical point since the device cannot be physically

6   searched, it is more reasonable to get the search warrant when

7   it is actually feasible to actually execute the search

8   warrant.

9        Even if we get a search warrant for all the six

10  devices, the issue will remain that we actually cannot get

11  into those devices, so those warrants will actually be --

12        THE COURT:  Do you concede that you have not

13  complied with the terms of the warrant from California?  Do

14  you concede that?

15        MR. PARK:  Yes, Your Honor, within the straight

16  120 --

17        THE COURT:  Why didn't you go back and ask, you

18  know, to hold them longer even, even if you weren't

19  necessarily saying search them, why didn't you ask to go back

20  and hold them?

21        MR. PARK:  The devices were at that point physically

22  in law enforcement possession here in New York, and it was our

23  intention to get a search warrant when the device became

24  available at the jurisdiction where the devices are currently

25  located.

PROCEEDINGS                                      31

1           THE COURT:  But listening to the terms of what

2    Mr. Mazurek just read, which should -- what did the warrant

3    require you to do?  Get a search warrant here but then go back

4    to California, to the California judge to extend the time?

5           I'm not sure which judge.  To search it, you'd

6    obviously, since they're here, you go to a magistrate judge

7    here.

8           But what's your view of that, counsel?  In a

9    situation where it wasn't -- they couldn't encrypt them -- I

10   mean, they were encrypted and they couldn't actually search

11   them, which judge should they have gone back to?

12          MR. MAZUREK:  I think they can go to the court that

13   has jurisdiction where the device resided at that point in

14   time.

15          There's nothing in the warrant by the --

16          THE COURT:  So what should they have done?  Should

17   they have asked -- I know you say it wasn't timely in any

18   event, but should they have asked Judge Merkl?  What should

19   have done with respect to the other devices?

20          MR. MAZUREK:  Before the termination of this

21   warrant, the expiration of this warrant, under the express

22   terms of this warrant, they needed to go to a competent court

23   and seek a judicial authorization to maintain custody of that

24   device.

25          THE COURT:  Well, it would have been a request to

PROCEEDINGS                                                32

1    maintain custody.

2              MR. MAZUREK:  And to continue the search.

3              Because there are a number of cases that we cited in

4    our letter dated January 26th to the Court, which is ECF

5    Docket 104, the bottom of page 4, which have already ruled

6    that, in quotes, when law enforcement physically manipulates a

7    phone or otherwise tries to access the information inside, a

8    search occurs and a warrant is required.

9              That's *United States versus Slim,* a District of

10   South Dakota case dated July 30th, 2019, at 2019 Westlaw

11   7755298.  Also we cited another case in the District of

12   Massachusetts, *Alvarez versus the City of Worcester,* which

13   says, merely opening a flip phone to view the contents of the

14   inner screen of a phone constitutes a search because it

15   exposes a few concealed portions of the phone, end quote.

16             So there are a number of cases where the physical

17   manipulation of the device, that is what the government

18   continues to do today and has been doing ever since,

19   apparently, it seized the phones constitutes a search under

20   the Fourth Amendment.

21             THE COURT:  You mean trying to decrypt it is a

22   search itself?

23             MR. MAZUREK:  That is our position, because whenever

24   you physically invade a person -- private property of another

25   individual, which has the possibility of destroying that

1    property, and also has the ability, obviously, of getting

2    information extracted from it, the government is required to

3    have a constitutional warrant or a constitutional exception to

4    the warrant requirement to continue to manipulate the private

5    property of another.  And as I said, that's been the opinion

6    of a number of district courts throughout the country.

7           So that manipulation we believe requires a warrant.

8    It continues to be an unlawful search in our view, but even

9    today as they continue to plug in the devices, however, they

10   are attempting to decrypt them.

11          And so the obligation that the government has,

12   pursuant to the express terms of the California warrant, was

13   to go to as competent judicial officer in the jurisdiction

14   where those searches were taking place and obtain another

15   warrant.

16          The purpose for that is clear.  The magistrate in

17   California believed that that was a reasonable period to

18   continue to maintain someone -- to the question that Your

19   Honor had -- that was a reasonable period to continue to

20   maintain an individual citizen's private property under the

21   Fourth Amendment.

22          If the government believed that period should be

23   longer than that 120 days, it was obligated by that magistrate

24   judge to go back to the judicial officer and explain the

25   reasons why they maintain the ability and to have continuing

PROCEEDINGS                                        34

1   probable cause or reasonableness to continue the searches.

2              THE COURT:  Why does the -- in this context, though,

3   why does the probable cause change?  It's concededly they've

4   got the devices.

5              The probable cause, it seems, in light of the types

6   of documents they are looking for, why does the probable cause

7   dissipate over time.  Because they're saying that these phones

8   are going to contain information about something that happened

9   in the past.

10             So once you take the phone, how does probable cause

11  dissipate?

12             MR. MAZUREK:  Let me be clear.  I'm not saying

13  that -- I mean they might need to make that probable cause

14  showing again to a different magistrate just because it's a

15  different magistrate.

16             THE COURT:  Right.

17             MR. MAZUREK:  That I don't think is going to differ

18  based on the time period.  What will differ is the

19  reasonableness clause in the Fourth Amendment, whether it

20  continues to be reasonable for the government to search beyond

21  that period of time when at least this magistrate judge

22  believes was reasonable under the Fourth Amendment.

23             It's the reasonableness clause that I believe is at

24  play here within the Fourth Amendment, and certainly you can't

25  ignore the order by another judge.  Whether she's right or

1    wrong --

2            THE COURT:  Do you have cases where violations of

3    similar provisions the evidence has been suppressed?  The

4    remedy for that is supression?

5            MR. MAZUREK:  Yes, Your Honor.  It's also on page 4

6    of our January 26th letter.

7            There are cases that where for the reasons that we

8    are claiming that doing searches beyond the permitted terms of

9    a validly-issued warrant says that the search and any

10   subsequent seizure are unconstitutional.  In fact, the case

11   that stems from that is from the highest court in the land,

12   the Supreme Court.  The case is *Horton*, H-O-R-T-O-N, *versus*

13   *California,* and the cite is 496 US 128, it's a 1990 case.

14           And the specific quote is if, in quotes, the scope

15   of a search seized that permitted by the terms of a

16   validly-issued warrant search and any subsequent seizure are

17   unconstitutional, end quote.

18           Also it cites a Second Circuit case, *United States*

19   *versus Matias*.  That's spelled M-A-T-I-A-S, at 836 --

20           THE COURT:  That was Judge Irizarry's case, correct?

21   It was from the Eastern District?

22           MR. MAZUREK:  I'm not quite sure of that.  Second

23   Circuit 1988 case, so I don't think so.

24           THE COURT:  Oh, no, okay.

25           MR. MAZUREK:  So, again, the Supreme Court has said

PROCEEDINGS                                            36

1   if you expressly violate the terms of a warrant, then

2   supression is the remedy that is required.

3           I mean at this stage, while there are no responsive

4   documents, I think the appropriate remedy here is for return

5   of the property.

6           The only other potential remedy that the government

7   could seek at this stage would be seeking a warrant now that

8   many months after the expiration of the earlier warrant.  And

9   we would say that under Judge Block's case in *United States*

10  *versus Cioffi* --

11          THE COURT:  Can you hold on just a second?

12          (Pause in the proceedings.)

13          THE COURT:  Okay.  I'm sorry, go ahead.

14          MR. MAZUREK:  C-I-O-F-F-I.  And that is 668

15  F.Supp.2d 385, where Judge Block aptly noted that, in quotes,

16  no court has ever endorsed the view that it would allow the

17  government to retroactively cure a Fourth Amendment violation,

18  and it is easy to see why.  The violation is not the discovery

19  of incriminating evidence, but the invasion of the searchee's

20  privacy.  Since such a violation is inherently irremediable,

21  the exclusionary rule exists to deter violations in the first

22  instance, end quote.

23          So a retroactive attempt to obtain a warrant past

24  the time when the government constitutionally could continue

25  to search and seize property has never been endorsed by

PROCEEDINGS                                          37

1    federal courts.

2         So we would urge the Court today that they should be

3    order to return those five devices because there's no

4    constitutional and permissible way for the government to

5    continue to maintain them.

6         THE COURT:  All right, before I address some of the

7    other issues, Mr. Park, do you want to say anything further?

8         MR. PARK:  Just that, Your Honor, that the law

9    enforcement the government has searched these phones was, you

10   know, understanding that is not, you know, in terms of the --

11   in line with the 120-strict rule by the search warrant from

12   California, but we submit that the effort to search was

13   reasonable, those devices were seized pursuant to an

14   authorized warrant, and we -- law enforcement relied on good

15   faith of that search warrant attempt to search that --

16        THE COURT:  What's good faith?  I don't see how good

17   faith comes into it.  If the agents read the warrant and it

18   says 120 days, how do you rely on good faith?  I don't know

19   how that comes into the equation.

20        MR. PARK:  Your Honor, as the government recently

21   demonstrated, the government does not intend to search these

22   phones without obtaining a subsequent warrant, even if and

23   when these devices do become unencrypted and technically be,

24   you know, accessible for review of the content of these

25   phones.

PROCEEDINGS                                            38

1           THE COURT:  So it's the government's view that once

2    they decrypt one of the phones, assuming that they can, then

3    they'll go get a search warrant.

4           MR. PARK:  That's the government's intention at this

5    point, Your Honor, but the government can certainly pursue a

6    search warrant for all remaining five devices now.

7           THE COURT:  I thought that's what you told me you

8    were going to do.  Maybe I misread the papers, but I thought

9    you said that's what you were going to do.

10          Am I right about that?

11          MR. PARK:  It's possible, Your Honor, I would have

12   to go back and check.

13          THE COURT:  Well, where is the outer limits of this,

14   Mr. Park?  Is it -- you know, how long can you hold them to

15   try to decrypt them?  What's the outer limits of this?

16          I mean, the search warrant tried to provide some

17   basis to give you some leeway, you know, you have 120 days,

18   you can't do it, you come back, that was ignored.

19          What's the outer limits if we're talking not about

20   the contents of the search warrant but about reasonableness of

21   the Fourth Amendment, how long can you hold them?  Give me a

22   time.

23          MR. PARK:  Your Honor, in terms of the technology of

24   the encryption, it's really impossible to tell from the

25   government's perspective whether these devices will become

1   accessible prior to the trial.

2          THE COURT:  So, okay, they're not.  Trial goes

3   forward, you haven't decrypted them, do you have to turn them

4   over after the trial is over?

5          MR. PARK:  We certainly -- if that is the case, we

6   certainly will turn it over, turn the devices over at that

7   point.

8          THE COURT:  So then the rule is if you haven't done

9   them before trial, and there's a trial, at the end of the

10  trial you would turn them over, you return the property.

11  That's your standard?

12         MR. PARK:  I mean, I don't know if that will say

13  that is the standard, but that's -- I mean that's -- if we're

14  talking in terms of timelining, what I can say as certainty

15  now without absolutely knowing when the phones will become

16  accessible, the government certainly will return the devices

17  if they remain inaccessible until the day of the trial.  Then

18  obviously once we're at trial, we will return these devices

19  for sure.

20         THE COURT:  Let me turn to another issue that was

21  raised with regard to the --

22         MR. MAZUREK:  Judge, can I just say one thing in

23  response?

24         THE COURT:  Yes.

25         MR. MAZUREK:  The government may have their view of

PROCEEDINGS                                          40

1   what is reasonable under the Fourth Amendment, but right now

2   they're in violation of a warrant.  The warrant expired.  They

3   have no warrant now, and they have no valid exception to the

4   warrant without cause in the Fourth Amendment to continue to

5   hold my client's property.  It must be returned.

6          THE COURT:  Yes, I understand that's your position

7   and, you know, I will issue an opinion relating to all of

8   these issues.

9          But let me just turn to another issue, the

10  marijuana.

11         The government doesn't intend to offer this

12  evidence, the marijuana, in evidence at trial, correct?

13         MR. PARK:  We're not -- we cannot give a certain

14  answer at this point, Your Honor.

15         THE COURT:  What would it be remotely relevant to?

16         MR. PARK:  It will be relevant, Your Honor, for

17  corroboration for proffers in evidence to establish the

18  relationship among at least three of the defendants in this

19  case, specifically Mr. Zhang, Mr. You You and Mr. Abreu.  It's

20  the government's position that their relationship really is

21  heavily connected to and in cases stems from their involvement

22  in the marijuana business.

23         So the fact that bulk marijuana, consistent with

24  distribution and engaging in trafficking of marijuana as a

25  business, can certainly be evidence to further corroborate the

PROCEEDINGS                                                    41

1   relationship among the defendants in this case.

2            THE COURT:  How can you argue that the information

3   with respect to drug trafficking that happened a number of

4   years ago by conspirators, I think who were both in prison,

5   how that information is not stale?

6            I mean apart from the fraud and everything else, if

7   you walked into a magistrate judge in this district with a

8   warrant and said the last information that we had that this

9   individual was doing narcotics was over two years ago, and by

10  the way, we don't have any information that he was operating

11  out of his house with narcotics, how do you think you would

12  get a warrant?

13           MR. PARK:  Your Honor --

14           THE COURT:  For narcotics?  I'm just talking about

15  for narcotics.

16           MR. PARK:  Your Honor, first of all, there's case

17  law in the Second Circuit that specifically mentions when it

18  comes to narcotics conspiracies, the continued enterprise --

19           THE COURT:  What was continuing?  What evidence did

20  you have that anything was continuing?

21           MR. PARK:  The evidence is that Mr. Zhe was running

22  a business as a marijuana dealer.  There's evidence --

23           THE COURT:  Back in what year?  When does your

24  evidence of that stop?

25           MR. PARK:  Your Honor, there's a communication

PROCEEDINGS                                                    42

1    that's based from 2018 through 2020.

2              THE COURT:  That's two years ago.

3              Was there any evidence by the co-conspirators that

4    he was dealing marijuana out of his house?

5              MR. PARK:  Not specifically out of the house, Your

6    Honor, but, you know, that was his business.  That was, you

7    know, his livelihood.

8              THE COURT:  Two years ago.

9              MR. PARK:  Yes, Your Honor, but it is a -- the very

10   nature of the narcotics activity was something that's ongoing.

11   That is his livelihood.  That's how he made money.

12             THE COURT:  It may have been his livelihood two

13   years ago, how did you know it was his livelihood when you

14   went to go for the warrant?

15             MR. PARK:  Well, based on the information the office

16   had obtained at the time, I don't think it was unreasonable to

17   make a logical inference that Mr. Zhang would still engage in

18   that conduct by dealing marijuana.

19             THE COURT:  Why would it be found in his house?

20             What did the other people say about doing business

21   with him?  Did they say that he kept it in his house when they

22   were doing business with him?

23             MR. PARK:  I mean it's not -- I don't believe it's

24   specifically mentioned in the affidavit, but we certainly have

25   information, the government had information that Mr. Zhang, at

PROCEEDINGS                                    43

1  least while he was in New York, he was running some of the

2  marijuana business out of his house.

3           THE COURT:  Is that in the warrant?

4           MR. PARK:  That is not in the warrant, Your Honor.

5           THE COURT:  Well, that's going to be a problem then.

6           In terms of the search of Mr. Zhang's home, one of

7  the grounds that you look for was this evidence of witness

8  intimidation.

9           Did you find documents or evidence relating to

10 witness intimidation in his home?

11          MR. PARK:  We found in his devices, Your Honor.

12          THE COURT:  In his devices?

13          MR. PARK:  Yes, Your Honor.

14          THE COURT:  How is that --

15          MR. PARK:  Well, in his Instagram account, Your

16 Honor.

17          THE COURT:  Oh, that's a different warrant then.

18          But the same information was -- I just don't recall,

19 the same information was put forth in the Instagram warrant

20 that was --

21          MR. PARK:  Yes, Your Honor, that information was

22 put -- the same information was put forth in both the

23 Instagram affidavit and the residence affidavit.

24          THE COURT:  Are you going to somehow seek to

25 introduce that evidence into this trial?

PROCEEDINGS                    44

1          MR. PARK:  The witness intimidation, Your Honor?

2          THE COURT:  Yes.

3          MR. PARK:  There is -- only to the extent that some

4    of the witness intimidation information concerns the other

5    codefendant in this case, Abreu, because some of the witness

6    intimidation evidence concerns Mr. Abreu's prior federal

7    conviction.

8          So again --

9          THE COURT:  But why would be relevant to this case?

10         MR. PARK:  It's just a corroboration that the

11   relationship between Mr. Zhang and Mr. Abreu.

12         And I can establish the relationship when we're

13   talking about conspiracy and conspiracy to commit this murder,

14   especially when it's the government's position that Mr. Zhe --

15   Mr. Zhang is the one who solicited or otherwise hired

16   Mr. Abreu to carry out the murder.

17         We also know for Instagram, there were mentions of a

18   luxury watch that Mr. Zhang gifted to Abreu, and it's the

19   government's position that that was part of the payment for

20   carrying out the murder.

21         THE COURT:  Okay.  Mr. Mazurek, did you want to

22   comment or is your cocounsel going to address that issue, or

23   are you the marijuana person?

24         MR. MAZUREK:  I'm the marijuana person.

25         THE COURT:  Okay.

PROCEEDINGS                                    45

1          MR. MAZUREK:  I never said that before.

2          THE COURT:  I know.  I just led you into that one,

3   I'm sorry.

4          MR. MAZUREK:  For purposes of this proceeding only.

5          Your Honor, we do believe that the government has

6   failed to make any kind of nexus to a probable cause showing

7   for the place to be searched with respect to the marijuana

8   business, the narcotics offenses.  There's no temporal

9   connection.

10         As Your Honor mentioned, April 2020 was the last

11  time one of the cooperating witnesses, CW3, had any

12  information relating to Mr. Zhang.  The government knows that

13  at that point in time Mr. Zhang wasn't even living in

14  California, he was living in New York.  Mr. Zhang subsequently

15  moved to California.

16         There is no evidence to suggest in the affidavit

17  that the government had probable cause to believe that

18  Mr. Zhang was continuing a narcotics business after he moved

19  to California.  That there would be probable cause to believe

20  that the places to be searched would reveal that.  There

21  simply is absolutely no evidence.  There's the 25-month gap

22  between the time that CW3 was arrested and the search warrant

23  was executed on May 10th of 2022.  So we do believe it

24  absolutely fails a probable cause showing.  It fails the

25  constitutional requirement.

PROCEEDINGS                                46

1          Now, in addition to the narcotics piece of this, the

2     government also sought under what we're trying in this case,

3     the murder for hire, there's even a larger gap in time between

4     the event, and that is a singular event as opposed to their

5     alleged ongoing enterprise which they don't have evidence

6     other than the narcotics, but the singular event of the murder

7     for hire occurred February 12th of 2019.

8          It was 39 months later when they searched

9     Mr. Zhang's California residence on May 10th of 2022.  And it

10    was 29 months after the last piece of evidence identified in

11    the affidavit, which the government claims is part of the

12    evidence of the murder for hire, and that is the December 2019

13    payment from an Allen Yu business to a business that was

14    associated with Mr. Zhang.

15          THE COURT:  The difference is that the type of

16    things that they were trying to search for.  I mean, documents

17    could still exist that support that.  Phones could still have

18    records of discussions, whereas drugs are considered to be, go

19    in and out; you know, the staleness it seems, applies with

20    more force to the narcotics then it would to those types of

21    records.

22          MR. MAZUREK:  Your Honor, I would respectfully

23    disagree.  And this is because what the government is arguing

24    here, and they haven't put any contours on it whatsoever, is

25    to say that if you have -- this is really a scary proposition

PROCEEDINGS                                    47

1   in my mind.

2           If you have an electronic device, which we all,

3   every one of us, many electronic devices, if you have

4   electronic devices in your personal life, and the government

5   believes that they have evidence you committed a crime,

6   probable cause.  Their position is, and it really puts the

7   constitutional jurisprudence on its head, is that those

8   electronic devices are most likely kept at your home, which

9   under over a hundred years of constitutional jurisprudence

10  have said that the home is the one place that has a heightened

11  privacy.  The government is now saying because you have an

12  electronic device, and that electronic device is most likely

13  found at your home, then, this is a quote from their brief,

14  common sense indicates that individuals store their phones and

15  computers for several years and likely in their home.

16          What the government is saying is that they -- any

17  federal law enforcement officer can raid a person's home to

18  capture their electronic devices for several years after they

19  have probable cause of a crime.

20          I respectfully submit, Your Honor, that cannot be

21  the law and should not be the law going forward.  We have

22  citizens and there's a legion of cases after *Riley versus*

23  *California* from the Supreme Court that say that today most of

24  our lives as citizens are located on these little devices.

25          THE COURT:  Isn't that our problem, though?  In

1    other words, if the government has evidence that a crime took

2    place in 2020, and this is not this case, and photographs, the

3    person was known to use their phone and take photographs of

4    activities that the person engaged in, it is certainly

5    reasonable to believe that 20 -- photographs taken in 2020 are

6    still going to be on that phone.

7              MR. MAZUREK:  Your Honor, I respectfully disagree.

8    I would say that --

9              THE COURT:  Your phone doesn't hold photographs from

10   2020?

11             MR. MAZUREK:  Here is -- I'm not going to answer

12   that.

13             THE COURT:  You don't have to answer that.

14             MR. MAZUREK:  But I think the issue needs to be

15   framed different.  It's not whether the device would

16   reasonably have and still be on that phone, it certainly has

17   the capabilities.  But if we start making that the

18   perspective, then there's not going to be any temporal nexus

19   at all to between the probable cause finding and the place to

20   be searched.

21             Because these things have the capabilities of

22   maintaining things forever.  So what the perspective should be

23   is that whether it is reasonable for the government, whether

24   their information is timely enough to suggest that the person

25   that they are investigating would have a reason, other than

PROCEEDINGS                                    49

1    the fact that their phone has the technological capability to

2    maintain photos or documents for that long, but they need to

3    have some other showing that that individual had -- as to

4    whether they had probable cause to show would have maintained

5    it on these kind of electronic devices.  And that's what I'm

6    saying that they did not show in this case.

7           It cannot be enough to simply say common sense tells

8    us -- technology tells us these phones and electronic devices

9    can maintain these things forever.  But that can't be the

10   contours of what the Fourth Amendment permits.  There has to

11   be some showing, some particularized showing for the

12   individual that they store their information that long.

13          And it's not that different from the digital world

14   and the physical world.  Back before all these phones, I

15   remember at times they have to make a showing that -- the

16   government has to make a showing that, in fact, if they're

17   seeking a photograph that they believe -- they have evidence

18   that was taken more than six months ago, they had to show why

19   that photograph might still be found in that person's home.

20          And, in fact, there's case law that says that, that

21   we cited in our papers.  In *United States versus Zimmermann*, a

22   Third Circuit case in 2002, which is in our brief, the Third

23   Circuit affirmed the supression of evidence when the

24   government put in an affidavit, the law enforcement put in an

25   affidavit that they had evidence that there's photo evidence

1    that was more than six months old or six months taken earlier

2    from the date of the search warrant affidavit, and the Third

3    Circuit in that case in *Zimmermann* said that was stale because

4    they had not provided additional evidence to suggest that that

5    photograph would still be maintained in the home.

6            This is not any different.  Digital evidence should

7    not be viewed different than how they looked at tangible

8    evidence, because if we look at it differently only because of

9    the technology, that is that our phones have the capability to

10   store things forever, then we eliminate the contours of the

11   Fourth Amendment, we eliminate the requirements that a

12   particularized showing needs to be made that there's probable

13   cause to believe that the individual maintains that

14   information on the device beyond a certain period of time.

15   And it can't be that the Fourth Amendment sort of evaporates

16   because technology has gotten so good, that hold on data, and

17   that's what we would --

18           THE COURT:  So you're saying -- what you're saying

19   is there has to be some probable cause that this is how this

20   particular defendant interacted with his digital data.

21           MR. MAZUREK:  That is correct, Your Honor.  That is

22   our position.

23           THE COURT:  Okay.

24           MR. MAZUREK:  And this case obviously there is no

25   evidence of that.

1          And also, Your Honor, just in terms of the probable

2   cause showing that was made with respect to the murder for

3   hire offenses, that was shown by the government in this case,

4   it is very, very thin with respect to Mr. Zhang.  And here,

5   again, I think the probable cause showing has to be a little

6   bit more than an individual uses a cell phone.

7          The only evidence that's cited in the search warrant

8   affidavit, which allowed them to take -- if you look at

9   Attachment A as the items that they seized, every kind of

10  electronic device known to mankind, external storage devices,

11  desktop, laptop computers, towers, sim cards, everything.

12         The only electronic evidence that was identified for

13  the probable cause showing for these particular items in the

14  California warrant show that there were communications, cell

15  phone communications, phone calls, three phone calls between

16  my client and Codefendant You You on February 8th of 2019, and

17  seven text messages on February 10th of 2019.

18         No contents was identified, only the fact that the

19  two phones connected on those few times on those two dates.

20         THE COURT:  Well, those are pretty critical dates,

21  though, correct?

22         MR. MAZUREK:  They are within the same week of the

23  alleged murder for hire.  There's evidence that the government

24  had amassed that these two individuals had known each other

25  for a long period of time.  They were in business together.

PROCEEDINGS                                                          52

1  They were -- they grew up in the same neighborhood in

2  Flushing, Queens.

3         So the fact that there were a few calls without

4  content that the government is suggesting somehow goes to

5  probable cause to believe that Mr. Zhang used cellular devices

6  or electronic devices of any kind in the commission of the

7  crime is very, very scare.

8         And, Your Honor, the only other place is on -- in

9  paragraph 41 of the warrant, that's Bates Number 2550, and

10 this is just totally made up speculation by the government.

11        The government said today in their argument that

12 there was a conversation between Zhang and Abreu about a

13 luxury watch, and that conversation was in September of 2021,

14 that's just not true.  We'll get the warrant affidavit, it's

15 on page -- paragraph 41, there is a conversation that a law

16 enforcement agent includes between Abreu and someone

17 unidentified as User 1, not someone identified as Mr. Zhang,

18 where Mr. Abreu on some random date in September of 2021,

19 which is many -- more than two years, two and a half years

20 after the murder for hire, talks about Abreu with this unknown

21 other person says I got paid with this Richard, which is a

22 type of watch, and now it needs -- it's not very well -- the

23 English is not very good.  It says in the affidavit, I got

24 paid with this Richard at (indiscernible) and now I need to

25 fix that first, period.

1          There's no indication that this watch had anything

2    to do with a murder for hire.  It was not a conversation

3    between Abreu and a device identified as Mr. Zhang.  It was

4    with an unidentified User 1, and it's talking about he got

5    paid for work and needs to get a watch fixed.

6          So to say that that is probable cause to believe

7    that's a more recent communication that's talking about the

8    murder for hire is just wrong.  It's pure speculation, and

9    it's not what the government just represented to you earlier

10   today.

11         THE COURT:  Mr. Mazurek, to the extent that this

12   search warrant for digital information is sort of a new area

13   and, you know, it's not clear what agents can and cannot do,

14   why doesn't the good faith exception apply here?  Even if

15   you're correct about the legality of it or it's too invasive?

16         In light of the uncertainty, I mean there is no one

17   case you can point to to say that an agent should have known

18   that seeking this type of information was -- it was so clear

19   that you couldn't do this, that he couldn't rely on a

20   magistrate saying it's fine, you can.

21         MR. MAZUREK:  Well, Your Honor, I would suggest

22   that -- two responses to that.

23         First, the agents know this search warrant was

24   executed in May of 2022.  *Wiley versus California* was decided

25   in 2014.  That's almost a decade before.

PROCEEDINGS                                    54

1          Electronic devices have been identified as having

2     privacy interests, particularly cellular phones, smartphones.

3          And two, the search itself, with respect to the

4     probable cause showing that was put into the warrant, because

5     of the scant evidence that was identified with respect to

6     Mr. Zhang and, again, just an example of that, is putting in

7     random communications by another codefendant and attributing

8     it to Mr. Zhang is not in good faith.

9          There was no connection in the paragraph 41, as I

10    just told you about Mr. Zhang and yet it was being relied upon

11    by the agent.  That's not something the agent --

12         THE COURT:  Did the agent say that User 1 was Zhang?

13         MR. MAZUREK:  It says, given the conversation,

14    acknowledging the watch was in payment, and in quotes, payment

15    for work done in September of 2021, it says the photographs

16    indicating it was previously Zhang's watch, and the timing of

17    Abreu's receipt of the watch, there's probable cause Zhang

18    provided the watch as payment to Abreu for killing Yu.

19         THE COURT:  But there was another photograph that

20    showed that this watch had been in Mr. Zhang's possession,

21    correct?

22         MR. MAZUREK:  Well, I mean I think that will be a

23    matter of great disputes whether the government can compare

24    photographs of two watches that they have that they are the

25    same watch.  I think that will be a matter of a lot of

1    dispute.

2           But, Your Honor, more importantly than that, is that

3    there's no indication that -- I mean it's pure speculation

4    that the connecting of this particular watch and this

5    conversation, which is not with Mr. Zhang, with payment for a

6    murder that took place at that point, in September of 2021,

7    more than two and a half years prior to that.

8           So there's a lot of -- a lot of guessing going on by

9    the agents.  And, in fact, in paragraph 53, this is the

10   entirety of their justification for allowing for the complete

11   seisure of every single electronic device in my client's

12   house, you know, 39 months after the alleged murder for hire,

13   is that the entire probable cause showing in paragraph 53

14   which says in quotes, there's probable cause to believe that

15   information from the relevant time period may remain

16   accessible at the subject premises.  For instance, in my

17   training and experience, I understand that given the cost of

18   cellular telephones, individuals often keep their cellular

19   telephones and other digital devices for several months, end

20   quote.

21          So the entire probable cause showing for the -- to

22   allow the indiscriminate seizure of every single electronic

23   device from my client's home is based on suggestion by a law

24   enforcement agent that because these things are expensive,

25   they cost a lot, that it's more likely that everything is

PROCEEDINGS                                    56

1   going to be maintained for several years before all these

2   phones.

3            That's not done in good faith.  That's not expert

4   opinion.  That's not an agent offering, based on training and

5   experience, it's a single statement that talks about the cost

6   of a cellular telephone, and that is giving rise to probable

7   cause for indiscriminate seizure of these electronic device.

8            THE COURT:  Why isn't that accurate?

9            MR. MAZUREK:  I'm sorry?

10            THE COURT:  Why isn't that statement accurate?

11   What's false about it?

12            MR. MAZUREK:  Your Honor, I don't -- I don't think

13   it's a question of truth or falsity, I think it's a question

14   of whether it is based on law enforcement experience,

15   techniques, training, some specialized knowledge which would

16   given rise to be able to say that that's probable cause to

17   believe that that kind of evidence is presiding in the -- is

18   residing on the electronic -- in the house which would then

19   contain the electronic devices.

20            It just is not based on a specialized knowledge that

21   gives rise to a level of probable cause to believe that that

22   place can be searched for evidence of a crime that happened to

23   be committed 39 months or prior.

24            THE COURT:  Okay, thank you.

25            MR. KOUSOUROS:  Judge, can I just one brief response

PROCEEDINGS                                           57

1    to the government, very brief.

2              THE COURT:  Okay.

3              MR. KOUSOUROS:  Judge, notwithstanding any

4    elasticity and staleness analysis, I want -- I ask the Court

5    to note that your focus -- part of the focus I think of the

6    Court in asking the government what you were looking for, what

7    documents you were looking for, and perhaps the difference

8    between narcotics being, you know, to go on after two years,

9    what I'd ask the Court to note is while they may have been

10   looking for financial records and so on and so forth, I don't

11   think it's just an issue of what you're hoping to find, it's

12   an issue of whether there is probable cause that it will be

13   found there.

14             And here my client had an office where he conducted

15   his business.  And the sole basis for assuming that some

16   evidence of his business would be found in his home is the

17   really unsupported statements that he made a few phone calls

18   from his house while conducting his business.  Not that he

19   called any of the codefendants.  Not that he called anybody

20   with relation to this, but that at home he may have used his

21   phone or emailed somebody for business affairs.

22             And I think there's a difference here in that he had

23   an office, continued to have an office at the time that the

24   search was conducted, and the business records you are looking

25   for, that was the place to go, assuming you had non-stale

PROCEEDINGS                                    58

1    information.

2              And, you know, we cite *United States versus Harley*,

3    and of course *United States versus Sing* for the proposition

4    that you have to show a nexus to the criminal activity.

5              And the government conceded today that what they

6    were looking for was not evidence of the criminal activity,

7    for example, communications between codefendants or

8    co-conspirators, but they wanted to know about Amaco's

9    business.  They wanted to know, you know, whatever financial

10   records there were or weren't in order to further support what

11   they believed may have been motive.

12             And there's no reason.  There's nothing in this

13   warrant to suggest that there was probable cause that that

14   would be in his house as opposed to his residence three years

15   later.

16             So I understand the Court's focus and what we were

17   looking to find, and understand that, but I would ask the

18   Court to note that there's just nothing in this affidavit to

19   support the notion that this evidence, which does not

20   necessarily relate to actual crime, would be in his home as

21   opposed to his office.

22             And with the Court's permission, I join with

23   Mr. Mazurek.  We've made many of the same arguments.  We don't

24   need to repeat them, but I would ask the Court to note as well

25   that overbreathe is an issue.  And in our case as well,

PROCEEDINGS                                              59

1   there's four phone calls, really three phone calls with a

2   phone, not one allegation of any other device, no email, no

3   nothing, just a phone, and yet this warrant authorizes

4   seizure, and as you have noted, of every electronic device in

5   his house that they can then scour through in order to then

6   report to the Court that they found something responsive.

7            THE COURT:  All right, thank you.

8            All right, I think I understand the argument with

9   regard to the Instagram.  I didn't know if you wanted to say

10  anything.

11           MR. SER:  Unless Your Honor had specific questions,

12  I think in light of your comments.

13           THE COURT:  Okay.  All right.

14           Thank you.  I'll reserve decision.

15           MR. MAZUREK:  Just one -- I'm sorry, one last thing

16  I just wanted to put on the record.

17           THE COURT:  Yes.

18           MR. MAZUREK:  Very briefly.

19           On the issue of the return of the five cell phone

20  devices that we believe that the government continues to hold

21  without a constitutional basis, if before the Court issues its

22  decision here with respect to that, the government seeks to go

23  to a magistrate judge here in this district, I would ask you

24  to direct the government that they should inform that

25  magistrate judge that they have been in violation of the

1  California warrant for the last several months.  The omission

2  of that is not appropriate with respect to a new magistrate

3  making a decision of whether they should issue a subsequent

4  warrant.

5         THE COURT:  Mr. Park, do you want to respond to

6  that?

7         MR. PARK:  I mean the --

8         THE COURT:  It seems like you could provide the

9  magistrate with the former warrant.

10         MR. PARK:  That's what we have been doing, Your

11  Honor.

12         THE COURT:  Okay, that would solve that problem.

13         MR. PARK:  Your Honor, just in terms of the

14  affidavit from the agent regarding the search.

15         THE COURT:  Yes, the Cellebrite?

16         MR. PARK:  Yes, Your Honor.

17         May the government request one week?

18         THE COURT:  Yes, that's fine.

19         MR. PARK:  Thank you, Your Honor.

20         THE COURT:  All right.  Thank you.

21         THE COURTROOM DEPUTY:  All right, everyone, have a

22  good afternoon.

23

24         (Whereupon, the matter was concluded.)

25                *     *     *     *     *

*LINDA D. DANELCZYK, RPR, CSR, CCR*

I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.
/s/ Linda D. Danelczyk        August 8, 2023